202 N.J. Super. 98 (1985)
493 A.2d 1309
JOHN PUSHKO, PETITIONER-APPELLANT,
v.
BOARD OF TRUSTEES OF THE TEACHERS' PENSION AND ANNUITY FUND, RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued April 30, 1985.
Decided June 3, 1985.
Before Judges PRESSLER, BRODY and COHEN.
Fred J. Klein argued the cause for appellant (Fred J. Klein, attorney; John J. Sharkey, Jr., on the brief).
*99 Ellis I. Medoway, Deputy Attorney General, argued the cause for respondent (Irwin I. Kimmelman, Attorney General of New Jersey, attorney; James J. Ciancia, Assistant Attorney General, of counsel; Ellis I. Medoway, on the brief).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
John Pushko appeals from the denial by the Board of Trustees of the Teachers' Pension and Annuity Fund (Board) of his application for accidental disability retirement. We reverse.
To a significant extent the relevant facts are undisputed. Petitioner was employed by the Elizabeth Board of Education as a physical education teacher in 1968 and worked in that capacity until February 1981 when he became permanently disabled. His disability is wholly psychiatric in nature. He suffers from the irrational and uncontrollable fear of returning to work and of harming children in the school environment. He claims that these disabling phobias resulted from a combination of three specific job-related incidents.
The first of these incidents occurred in the school gymnasium on October 19, 1977. Petitioner sent a student who had come into the gym class in street clothes "to the office." Sometime later, as petitioner was about to leave the gym, the student hit him across the mouth, causing dental injuries and oral bleeding. Petitioner pinned him to the ground. Finally, three other teachers seemed to have him under control, and petitioner started to walk away to attend to his injuries. The student apparently broke loose, picked up a cane that another student had and hit petitioner over the back of the head with it. He again subdued the student who was finally taken away by other school personnel. Petitioner not only sustained physical injuries in this attack but also developed psychosomatic symptomotology, including a chronic nervous cough, attacks of diarrhea, and insomnia. He also was "feeling different anxieties." The school's physician referred him to a psychiatrist under whose care he remained for 8 months. He had never before been *100 treated by a psychiatrist or had felt himself to be in need of psychiatric treatment. Apparently he attempted to return to work shortly after the incident but was unable to do so. As he described his problem, "I had the nervous cough. I came back to teaching and I just broke out in a cold sweat." He finally did return to work 6 months after the incident and was apparently able to function as a teacher for the next several years, although when he first returned to work he was, on the recommendation of his psychiatrist, assigned to duties other than his regular physical education classes.
The second incident occurred on December 22, 1980, just before the Christmas recess. Petitioner was teaching in the gym when a student whom he knew to be an extortionist came into the gym and attacked two students who had not paid him the required 25 cents a week. One of the students was on the floor bleeding and the other one was having difficulty breathing. As petitioner was trying to assist these boys, the assailant punched him in the chest and threatened to get a gun and kill him. Petitioner believed these threats. The psychosomatic symptoms he had experienced after the 1977 attack recurred. He nevertheless returned to school after the Christmas recess.
The third and final incident occurred at the end of February, some two months after the second incident. It took place in a generally unused hallway in which two students were fighting, egged on by a group of about ten other students. As petitioner came upon the group, one of the participants was ready to stop fighting but the other one continued his attack. Petitioner broke up the fight by pushing the second student against the wall. Then, without being aware of what he was doing, he started to choke him. He was called to his senses by another teacher and released the boy. He was never able thereafter to return to teaching or able to overcome what were now, at least in medical opinion, irreversible phobias about teaching and harming children in school.
*101 Of significance is petitioner's predisposition to the psychiatric illness which finally disabled him. It was the undisputed testimony of the Board's examining psychiatrist that petitioner's "personality structure prior to developing symptomotology" was premorbid, that is, he had difficulty in "neutralizing anger." As the psychiatrist explained it,
Mr. Pushko had a personality and our personalities may predispose us to certain conditions.
It's when the condition  it is prior to the time that the condition emerges that we refer to as premorbid.
It was the further opinion of the psychiatrist that
* * * I think that his personality had been tested for so long and that his  what we refer to as his ego strengths had been tested for so long that at that particular time, because of his unconscious need to be in control, he lost control and this was  he described it as going berserk and that loss of control was a very frightening experience for him and that he apparently didn't have before at least he didn't relate it in the history and subsequent to this is when he began to experience his different symptoms.
In terms of the relationship of petitioner's underlying personality and the 1977 incident, the psychiatrist explained,
* * * that his personality structure was such that even though he had been able to in some way handle all the previous injustices maybe as he perceived them, that at this particular time, the anger that he experienced just overwhelmed him and the fear of losing control of that rage and his inability to suppress that rage then resulted in a number of symptoms. * * *
The psychiatrist was therefore of the opinion that the 1977 incident precipitated petitioner's condition "in terms of symptomotology." Regarding the 1977 event as the substantial precipitating cause, the psychiatrist explained the effect of the second two incidents as contributing to the permanency of the condition precipitated by the first incident. It was his testimony that
[t]he symptoms were not any worse after the third incident talking about those three incidents than they were after the first incident, but they became more permanent and I guess there was an escalation in terms of a fear of returning to work.
Based on the evidence and particularly on the psychiatric testimony, the administrative law judge was satisfied that petitioner had met the accidental disability criteria of N.J.S.A. 18A:66-39. More specifically, he concluded that petitioner's *102 permanent and total disability was the direct result of a traumatic event. In reaching this conclusion, the administrative law judge found that each of the three incidents combined to produce the disability, the first of them being the most significant. He was further of the view that each of the three incidents involved "the application of some kind of external force to the body or the violent exposure of the body to some external force." Cattani v. Bd. of Trustees, Police & Firemen's Retire. Sys., 69 N.J. 578, 586 (1976).
The Board rejected the administrative law judge's ultimate conclusion. It agreed that petitioner was permanently and totally disabled as a result of the three incidents, in combination with each other and with his predisposition. The reason for the Board's disagreement with the administrative law judge was its perception that each of the incidents had not met the "external force" test of Cattani, quoted supra. It was the Board's view that the second incident consisted of two separate events, the punch and the threat to kill and that the threat to kill component did not involve an external force. It also concluded that the final incident of February 1981 did not involve external force. Since all of the contributing incidents did not therefore meet the Cattani test, the Board concluded that petitioner was not entitled to an accidental disability pension. We are persuaded that the Board erred.
All the public employee pension statutes of this State now condition the right to accidental disability retirement on the showing that the employee "is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties." This is the standard not only of the Teachers Pension and Annuity Fund Law, N.J.S.A. 18A:66-1, et seq., but also of the Public Employees Retirement System, N.J.S.A. 43:15A-1, et seq., and the Police and Firemen's Retirement System, N.J.S.A. 43:16A-1, et seq. Compare N.J.S.A. 18A:66-39(c), N.J.S.A. 43:15A-43, and N.J.S.A. 43:16A-7, all of which contain identical formulations. Consequently, judicial interpretation of the standard *103 or of any of its components in the context of one statute is applicable to all. The courts of this State have indeed wrestled with this standard over the last decade but never, insofar as we can determine, in a case in which the total disability is wholly psychiatric in nature. We believe, however, that the definitional precepts which have been developed for determining the accidental status of a physical disability are generally applicable to a psychiatric disability and that proper application of those precepts here dictate the qualification of petitioner's disability as an accidental one.
As we have already pointed out, the Board was satisfied that, petitioner's preexisting psychiatric condition notwithstanding, his total disability was caused by the three incidents, all of which occurred during the performance of his duties. See Gerba v. Public Employees' Retire. Sys. Trustees, 83 N.J. 174, 187 (1980). The only component of the statutory formulation which, in the Board's view, petitioner had failed to meet was that of "traumatic event." With respect to the definition of this component, the Supreme Court in Cattani v. Bd. of Trustees, Police & Firemen's Retire. Sys., supra, 69 N.J. 578, started from the premise that the 1964 amendment of N.J.S.A. 43:16A-7, which introduced the current formulation, was "intended to make the granting of an accidental disability pension more difficult." Id. at 584. The Court therefore concluded that the term "traumatic event" had a narrower and more specific meaning than "accident," the term formerly used by the pension statutes, and a narrower and more specific meaning than "traumatic injury," the term commonly used in analyzing workers' compensation cases. Id. at 585-586. Focusing, therefore, on the nature of the injury-producing event rather than on the nature of the injury, the Court held that the phrase "`traumatic event' would ordinarily involve a mishap or accident involving the application of some kind of external force to the body or the violent exposure of the body to some external *104 force." (Emphasis added) Id. at 586. The Court expressly recognized, however, that this definition "may not be all-inclusive and that a traumatic event may possibly be found in some situations which do not literally fall within the external force or violence concept." Ibid. And cf. In re Iannelli, 157 N.J. Super. 324 (App.Div. 1978).
If all of the contributing incidents here had involved application of external force to the body or the violent exposure of the body to some external force, there would be no question that petitioner would have met the literal terms of the Cattani standard even though the resulting injury was psychiatric rather than physical. And while we do not necessarily agree with the Board that the second incident consisted of two discrete and separable events, one physical and one not, we are bound by the Board's finding that the third incident lacked the element of external force to the body, and we accept its holding that all three incidents were required to meet the traumatic event definition. See Toma v. Police & Firemen's Retirement System, 172 N.J. Super. 76 (App.Div. 1980). We must therefore consider whether this is an extraordinary case in which an event not involving either external force to the body or violent exposure of the body to external force is nevertheless classifiable as traumatic.
We predicate our analysis on the virtually axiomatic proposition, with which the Board's psychiatrist agreed, that an emotional trauma can be as disabling to the mind as a physical trauma can be to the body. Physical trauma is, of course, the reaction of the body to physical force. Psychic trauma is the reaction of the mind to an occurrence which may or may not involve physical force applied to the body. If that occurrence results in the disabling of one's mental or emotional processes, it constitutes no less an externally applied blow to the mind than a physical force constitutes an externally applied blow to the body. The Cattani formulation was designed to deal with *105 physical trauma only. Obviously, however, the Court did not intend thereby to exclude from qualification for accidental-disability pension those employees disabled by emotional trauma. And as to those employees, the standard of external force to the body or the violent exposure of the body to external force does not really apply at all. We believe, however, that in the context of emotional trauma the general "external force or violence concept" prescribed by Cattani can be applied if the object of the force or violence is understood to be the mind rather than the body. Indeed, psychic trauma has been defined as "an external force or series of events [which] impinges on the mind and emotions, as distinguished from the physical body." Gordy-Gray, 1 Attorneys' Textbook of Medicine, § 1.20 at 1-7 (3rd ed. 1974).[1] The record here leaves no question but that the three incidents attributed by the Board's psychiatrist as the cause of petitioner's disability all met this definition of a psychic traumatic event.
The basis of the Board's denial of petitioner's application was its apparent belief that as a matter of law only external force to the body can qualify as a traumatic event. While we would ordinarily remand to the Board for its reconsideration of petitioner's application consistent with the principles we have herein stated, we are persuaded that such a remand would serve no useful purpose here. Since the three incidents here all clearly qualify as traumatic events even though they were psychiatrically rather than physically assaultive, we are satisfied that the Board's single concern has been overcome as a matter of law.
We reverse and remand to the Board of Trustees of the Teachers' Pension and Annuity Fund for its allowance to petitioner of an accidental disability pension.
NOTES
[1] We note that the Cattani definition of traumatic event relied in part on Black's Law Dictionary and Schmidt's Attorneys' Dictionary of Medicine.