889 A.2d 456 (2006)
382 N.J. Super. 366
I/M/O Robert PATTERSON, Petitioner-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued December 12, 2005.
Decided January 17, 2006.
Jerome A. Ballarotto, Lawrenceville, argued the cause for appellant.
Christine Lucarelli, Deputy Attorney General, argued the cause for respondent, Board of Trustees (Peter C. Harvey, Attorney General, attorney; Michael Haas, Assistant Attorney General, of counsel; Ms. Lucarelli, on the brief).
Before Judges CUFF, LINTNER and GILROY.
The opinion of the court was delivered by
*457 LINTNER, J.A.D.
Petitioner, Robert Patterson, appeals from a January 27, 2005, final determination by the Board of Trustees of the State Police Retirement System (the Board) rejecting an Administrative Law Judge's (ALJ) recommendation and denying Patterson's application for accidental disability benefits, N.J.S.A. 43:15A-43. Petitioner was rendered totally and permanently disabled from a combined Major Depression Disorder and Post Traumatic Stress Disorder as a direct result of a verbal assault committed by a squad sergeant. The central issue to be decided in this appeal is whether the abuse suffered by petitioner qualifies as a traumatic event in accordance with Kane v. Board of Trustees, Police & Firemen's Retirement System, 100 N.J. 651, 663, 498 A.2d 1252 (1985). Under the circumstances of this case, we conclude, that petitioner's permanent and total disability resulted directly from a series of traumatic psychic events entitling him to an accidental disability retirement allowance.
The undisputed facts, which were presented to the ALJ by stipulation, are as follows.[1] Petitioner enrolled in the State Police Retirement System in November 1987, at which time he was almost twenty-three years old. In January 1998, he was charged with domestic violence involving an altercation with his girlfriend wherein he broke her nose. As a result, he was required to surrender his service revolver, assigned to desk duty, and transferred to the Hightstown Station. At approximately 9:00 p.m. on the first day of his new assignment, petitioner, who was working the 2:00 p.m. to midnight shift, came in contact with the squad sergeant, supervisor of an overlapping shift. The squad sergeant assembled his subordinates in the briefing room while petitioner remained at his desk in the radio room. After the squad was assembled, the squad sergeant called petitioner into the briefing room and introduced him by saying:
This is Bob Patterson, he's a Fat Fuck, a piece of shit rat, he will drag you down, [d]on't look at him don't talk to him, if he says anything to you ignore him, have no interaction with him, he's only here until he gets fired.
The squad sergeant then told petitioner to get the "fuck" out of the room.
Petitioner returned to the radio room. He felt like vomiting. Later, the squad sergeant came into the radio room, stood directly in front of petitioner with clenched fists, and asked, "Do you have a problem?" Petitioner looked down rather than at the squad sergeant. The squad sergeant then asked, "Do you have a problem understanding me?" Petitioner responded "No sir." The squad sergeant then told petitioner to "go downstairs and get changed you piece of shit, I don't want to be in the same building as you." Petitioner obeyed. There was no doubt in petitioner's mind that if he did not submit he would be physically assaulted. As petitioner was about to leave the building, the squad sergeant approached and, standing a few inches from petitioner's face, said, "From now on when my squad relieves you, you are to leave the building, DO YOU UNDERSTAND?" Petitioner again felt that if he did not passively acquiesce to the squad sergeant's bullying he would be physically assaulted. Petitioner left and drove around for hours, contemplating suicide. He was "humiliated" and felt "stripped of [his] manhood." He finally arrived home at 3:00 a.m. but could not sleep.
*458 When petitioner returned to work, he was told by another Sergeant that he did not have to leave the building when the squad sergeant's squad reported for duty but he would have to go back to the detective's office and stay out of sight until the end of his shift. Petitioner stated in his affidavit that he "literally hid in a closet for months." According to petitioner, he felt physically ill at the start of his shift and was shunned by his colleagues. When he entered a room, the other troopers would leave. According to petitioner, he received telephone calls from other troopers he knew who told him that rumors were "spreading like wild fire."
At another time, following his altercation with the squad sergeant, petitioner attended in-service training with 100 other troopers. The speaker gave a lecture on troopers involved in domestic violence, using petitioner's pending case as an example. The troopers in the room laughed and shook their heads. He overheard other troopers say that his case had also been used as an example on other days when they attended the lecture. Petitioner gained 100 pounds and became increasingly introverted and depressed, until he could no longer perform his duties.
Petitioner was referred by a State Police physician to the Environmental and Occupational Health Services Institute (EOHSI) to be evaluated for fitness for duty. He was tested on June 4, 2002. In a report, the EOHSI found in part that petitioner
has been off duty on stress leave since May 2001 due to depression and anxiety he attributes to a hostile work environment. [Petitioner] meets DSM-IV criteria for current diagnoses of Major Depressive Disorder and Social Phobia. He also meets criteria for the provisional diagnosis of Binge Eating Disorder. Personality testing reveals paranoid ideation of delusional proportions, social alienation depression, and anxiety.
In a report dated June 27, 2002, petitioner's psychiatrist, Dr. Samuel Schneider, also diagnosed petitioner with "Major Depressive Disorder as well as features of a Post Traumatic Stress Disorder" and found that petitioner's life has "spiraled downward."
Dr. Carl J. Chiappetta, a Diplomate of the American Board of Psychiatry and Neurology, performed an independent psychiatric evaluation at the Board's request. In a report dated February 13, 2003, Dr. Chiappetta concluded that petitioner is "totally and permanently disabled from the performance of his job duties as a N.J. State Trooper." He also reported that in his professional opinion "the event of [February 1, 1998] `constitutes the essential significant or the substantial contributing cause of the disability.'" The Retirement System's Medical Review Board (MRB) concurred with Chiappetta's conclusions.
On April 11, 2003, the Board requested both Chiappetta and the MRB to explain how the "verbal altercation" of February 1 "could constitute the essential contributing cause of [petitioner's] total and permanent disability." Chiappetta responded on April 23, 2003. Rendering the same causation conclusion he had given in his earlier report, Chiappetta pointed out:
The work-related "occurrence" ... has been, and continues to be, the critical event in question. According to the applicant, that occurrence did not involve a simple one or two minute verbal altercation, but involved a number of comments and/or interactions on that day. Furthermore, the applicant described the events of that day as being only the "beginning" of a continuous process.
. . . .
What is important to consider is the fact that Trooper Patterson perceived the *459 events of [February 1, 1998] as the immediate/ongoing critical occurrence, which was only the beginning point of a downward spiral regarding his job.
. . . .
Therefore, I can only state that the IME Examiner is not the trier of truth. That is, the reviewing Board is ultimately given the responsibility to decide whether or not there was a "factual event" in regards to a traumatic incident. I can only report my opinions, which are based primarily on the "perceived" reactions and revelations of the applicant, barring actual documentation to the contrary.
The MRB reported again that it concurred with Chiappetta respecting causation.
Pointing out that "[t]he normal work of a trooper does not include public humiliation and/or threat of harm from a superior officer," the ALJ concluded "the combined public humiliation and fear of physical retribution coming as one event sequence on February 1, 1998, was ... a piercing assault upon the mind" and qualified as a traumatic event. The Board found that the ALJ's decision was "erroneous" because his conclusion of law ran "contrary to established precedent in this area." It differentiated the administrative decision in Just-Cornelius v. Bd. of Trustees of the State Police Ret. Sys., OAL Dkt. No. TYP 01804-95, decided August 29, 1997, where the petitioner, a female undercover trooper, was found to qualify for accidental disability based upon psychic trauma resulting from continued harassment from her supervisor over a period of months. The Board noted that, unlike the Just-Cornelius decision, petitioner's case involved "[a] single instance of abusive language" and fell "far short of the intense, sustained and brutal treatment experienced by that trooper." The Board also concluded that because the ALJ's decision was based upon stipulated facts and not a finding of credibility, it did not have to defer to the ALJ's conclusions of law, with which it disagreed.
To be eligible for an accidental disability allowance, a person must be found to be permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of the employee's duties. N.J.S.A. 43:16A-7(1). In Kane, supra, 100 N.J. at 663, 498 A.2d 1252, the Court enunciated a three-prong test for determining whether an event is traumatic. First, the injury must not have been "induced by the stress or strain of the normal work effort"; second, the employee must have "met involuntarily with the object or matter that was the source of the harm"; and third, the "source of the injury itself was a great rush of force or uncontrollable power." On appeal, the parties concede that the only issue to be resolved is whether the third prong is satisfied. The Board argues that petitioner failed to establish that his injuries were caused by a great rush of force or uncontrollable power. It asserts that the administrative decision in Just-Cornelius is an "aberration." It also distinguishes Just-Cornelius, contending that the facts there were "far more insidious" and involved intense and repugnant harassment occurring over a period of six years rather than a single incident. The Board finally asserts that Just-Cornelius is not binding upon us, but at the same time argues that it is inconsistent with other administrative decisions.
We need not consider the various administrative decisions. Instead, we begin our analysis with Pushko v. Board of Trustees of the Teachers' Pension & Annuity Fund, 208 N.J.Super. 141, 505 A.2d 154 (App.Div. 1986). In Pushko, the underlying question was whether a purely psychiatric trauma can constitute a "traumatic event" within *460 the Kane definition. Id. at 143-44, 505 A.2d 154. John Pushko, a physical education teacher, was brutally assaulted by a student who hit him across the face with a cane in October 1977. Id. at 142, 505 A.2d 154. In December 1980, Pushko was attacked by another student who punched him in the chest and threatened to get a gun and kill him. Id. at 142-43, 505 A.2d 154. In February 1981, while Pushko was walking a hallway, he came upon a group of ten students who were encouraging two male students engaged in a fistfight. Pushko broke up the fight. Pushing aside one of the students, and not being aware of what he was doing, he began choking the other student. Another teacher separated Pushko from the student. Id. at 143, 505 A.2d 154. The third episode was deemed to be a contributing cause of a psychic disability suffered by Pushko following that incident. Ibid. Differentiating between physical trauma and psychic assault, the panel in Pushko pointed out:
If petitioner's body had been struck as a result of trying to stop the fight, that physical blow, had it caused physical injury, would clearly have qualified as a great rush of force or uncontrollable power. Here it was petitioner's mind which was dealt a blow as a consequence of the fight. Thus, if the fight itself constituted a psychic assault which inevitably set into motion petitioner's physical and ultimately devastating psychological responses, it may be viewed as constituting an external uncontrollable power.
[Id. at 145-46, 505 A.2d 154 (emphasis added).]
We are aware that another panel of this court recently held that psychic stimulus alone, absent the application of "external physical force" does not qualify as a traumatic event sufficient to establish eligibility for accidental disability benefits under N.J.S.A. 43:15A-43. Moore v. Bd. of Trs. of the State Police Ret. Sys., 382 N.J.Super. 349, 358, 889 A.2d 445, 446. The panel in Moore rejected the theory espoused in Pushko, supra, 208 N.J.Super. 141, 505 A.2d 154, that a psychic assault could constitute a great rush of force or uncontrollable power and thus satisfy the third prong enumerated in Kane. Moore, supra, 382 N.J.Super. at 358, 889 A.2d at 451. Contrary to our colleagues, we conclude that, like the psychic event in Pushko, the squad sergeant's tirade and subsequent threats constituted an ongoing, continuous psychic assault amounting to a great rush of uncontrollable power.
The Board asserts that petitioner's reliance on Taylor v. Metzger, 152 N.J. 490, 706 A.2d 685 (1998), is misplaced. The plaintiff in Taylor, an African American woman, worked in the Burlington County Sheriff's Office. She claimed that she suffered emotional distress as a result of the utterance of a racial epithet against her by the Sheriff when she was being introduced to another supervisor, the Undersheriff. Concluding that "[r]acial slurs, especially when used by an employee's superior at the workplace, can wound," the Court held that the plaintiff presented sufficient evidence to withstand summary judgment on her claims for intentional infliction of emotional distress and violation of the Law Against Discrimination (LAD). Id. at 518-20, 706 A.2d 685.
At oral argument, the Board essentially argued that Taylor does not apply to the circumstances under consideration because the statutorily required traumatic event evidences the legislative intent to require something more than a single incident of abusive behavior. We agree that the proofs required to carry the day in an accidental disability claim under N.J.S.A. 43:16A-7 are different from those necessary *461 to establish violation of the LAD and intentional infliction of emotional distress. Where we part company with the Board is with its finding that the circumstances are insufficient to establish a traumatic event because it arises out of a single event of abusive language.
The undisputed evidence established that there was a series of events, albeit on the same day, which spontaneously progressed into an ongoing process leading inextricably to petitioner's psychological and physical disability. The first event occurred in the briefing room when the squad sergeant humiliated petitioner in front of the squad sergeant's subordinates and effectively ordered them not to interact with petitioner. The next event occurred after the squad sergeant completed the briefing and confronted petitioner in the radio room, rhetorically asking whether petitioner had a problem understanding him, and ordering him to leave the building. The third event occurred when petitioner was leaving and the squad sergeant told him to leave the building when his squad was present.
To be sure, the squad sergeant's abusive and brutal verbal confrontations amounted to psychic assaults. Coming from a superior officer in a paramilitary organization, the squad sergeant's verbal assaults had the indicia of great power. Moreover, they were not within petitioner's control. The ongoing deleterious effect of the squad sergeant's order to stay away was reinforced by the direction petitioner received from another superior officer that he hide in the detective's office when the squad sergeant's squad was present. That advice and the subsequent incidents of being shunned and mocked by colleagues were additional psychic events that served to intensify the February 1 traumatic events. Simply put, the undisputed evidence established multiple traumatic psychic events evidencing intense, brutal, and hostile treatment, not the "single instance of abusive language" characterized by the Board.
Equally unavailing is the Board's assertion that the ALJ placed too much weight on petitioner's statement that the squad sergeant's confrontations in the radio room and at the time he was leaving the building put him in fear for his personal safety. The Board concedes that it did not object to the submission of petitioner's affidavit, which was included in the stipulated facts and expressed petitioner's perception that he experienced fear for his personal safety during the confrontations with the squad sergeant. The Board also argues that there was "no mention that petitioner had such an intense fear in any of the three psychological evaluations."
Generally, an appellate tribunal need not consider questions not properly presented to a trial court, unless the issue raised concerns matters of great public interest. Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973). Contrary to the Board's assertion, however, there was sufficient evidence to support the ALJ's findings. Dr. Chiappetta's response to the Board's inquiry as to how the verbal altercation could constitute the essential contributing cause of petitioner's disability emphasized, "What is important" is that petitioner "perceived the events of [February 1, 1998] as the immediate/ongoing critical occurrence, which was only the beginning point of a downward spiral regarding his job." We are satisfied on this record that the ALJ was justified in his factual conclusions concerning the petitioner's perceived fear, given the confrontational setting in which petitioner found himself.
Reversed.
NOTES
[1] The stipulated facts appear in the ALJ's written decision and are acknowledged as stipulated by the Board in its final decision of January 27, 2005.