942 A.2d 782

ROBERT PATTERSON, PETITIONER–RESPONDENT, v. BOARD OF TRUSTEES, STATE POLICE RETIREMENT SYSTEM, RESPONDENT–APPELLANT.

GLYNN MOORE, PETITIONER–APPELLANT, v. BOARD OF TRUSTEES, STATE POLICE RETIREMENT SYSTEM, RESPONDENT–RESPONDENT.

JOSEPH GUADAGNO, PETITIONER–APPELLANT, v. BOARD OF TRUSTEES, POLICE AND FIREMEN'S RETIREMENT SYSTEM, RESPONDENT–RESPONDENT.

Argued October 10, 2006—Re-argued November 28, 2007—Decided March 11, 2008.

32

*Michael J. Haas,* Former Assistant Attorney General and *Eileen S. DenBleyker,* Deputy Attorney General, argued the cause for appellant in Patterson v. Board of Trustees, State Police

Retirement System and for respondent in Moore v. Board of Trustees, State Police Retirement System, and for respondent in Guadagno v. Board of Trustees, Police and Firemen's Retirement System (*Anne Milgram,* Attorney General of New Jersey, attorney; *Mr. Haas* and *Patrick DeAlmeida,* Assistant Attorney General, of counsel; *Mr. Haas* and *Ms. DenBleyker,* on the briefs).

*Nancy E. Whatley Griffin* argued the cause for appellant Glynn Moore.

*Vicki W. Beyer* argued the cause for appellant Joseph Guadagno (*Stark & Stark,* attorneys).

*Jerome A. Ballarotto* argued the cause for respondent Robert Patterson.

*Richard A. Friedman* and *Paul L. Kleinbaum* argued the cause for amicus curiae New Jersey State Policemen's Benevolent Association in Patterson v. Board of Trustees, State Police Retirement System and Moore v. Board of Trustees, State Police Retirement System (*Zazzali, Fagella, Nowak, Kleinbaum and Friedman,* attorneys; *Mr. Kleinbaum,* of counsel; *Mr. Kleinbaum* and *Jason E. Sokolowski,* on the briefs).

Justice LONG delivered the opinion of the Court.

Once again we are called upon to address the "traumatic event" standard under the accidental disability retirement provisions of the State Police Retirement System (SPRS), *N.J.S.A.* 53:5A–1 to –47, and the Police and Firemen's Retirement System (PFRS), *N.J.S.A.* 43:16A–1 to –68. In particular, we have been asked to determine whether an applicant who has suffered a permanent mental disability as a result of a mental stressor, without any physical impact, can be considered to have experienced a "traumatic event" and, if so, what standard should apply in assessing such a claim.

We conclude that the accidental disability statutes permit such a permanent mental injury to qualify a member for an accidental disability retirement. Like other accidental disability claimants, a member suffering from a so-called mental-mental injury must

satisfy the standards we recently enunciated in *Richardson v. Board of Trustees, Police and Firemen's Retirement System*, 192 *N.J.* 189, 927 *A.*2d 543 (2007), namely

1. that he is permanently and totally disabled;

2. as a direct result of a traumatic event that is

   a. identifiable as to time and place,

   b. undesigned and unexpected, and

   c. caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work);

3. that the traumatic event occurred during and as a result of the member's regular or assigned duties;

4. that the disability was not the result of the member's willful negligence; and

5. that the member is mentally or physically incapacitated from performing his usual or any other duty.

[*Id.* at 212–13, 927 *A.*2d 543.]

In addition, to carry out the legislative intent and to align the pension law with developments in other areas regarding post-traumatic mental injury, we add a requirement beyond those set forth in *Richardson:* The disability must result from direct personal experience of a terrifying or horror-inducing event that involves actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person. By that addition, we achieve the important assurance that the traumatic event posited as the basis for an accidental disability pension is not inconsequential but is objectively capable of causing a reasonable person in similar circumstances to suffer a disabling mental injury.

I

*Patterson v. Bd. of Trs., State Police Ret. Sys.*

Robert Patterson became a New Jersey State Police Officer in November 1987, at which time he was enrolled in the SPRS. Patterson was charged with a domestic violence offense for allegedly breaking his girlfriend's nose. As a result, he was prohibited from carrying a weapon and was reassigned to the Hightstown station, in 1998. According to an affidavit Patterson presented at

his pension hearing, the day that he first reported to his new assignment, February 1, 1998, a sergeant called a meeting at which he introduced Patterson to other officers in the following manner:

This is Bob Patterson, he's a Fat F**k, a piece of sh*t rat, he will drag you down, Don't look at him don't talk to him, if he says anything to you ignore him, have no interaction with him, he's only here until he gets fired.

The sergeant also told him to "get the f**k out." After Patterson returned to the radio room in which he had been working, the sergeant reportedly entered the room and, with clenched fists, ordered Patterson to "[g]o downstairs and get changed you piece of sh*t, I don't want to be in the same building as you." Patterson asserted that at the time he was fearful that if he did not submit, the sergeant would hit him. Patterson also stated that later, when exiting the building, the sergeant again approached him and informed him that "[f]rom now on when my squad relieves you, you are to leave the building." Again, Patterson believed the sergeant would have hit him had he questioned the sergeant's authority.

Patterson stated in his affidavit that as a result he was ostracized by his peers and became depressed and introverted. He also stated that he gained weight, lost interest in trying to better himself, and began to feel physically ill on days he had to work.

In July 2002, Patterson filed an application for an accidental disability retirement. The board determined that Patterson was permanently and totally disabled, awarding ordinary disability benefits and denying his application for accidental disability benefits. The board determined that, although Patterson's disability resulted directly from the events of February 1, 1998, those events did not constitute a "traumatic event."

The case was referred to the Office of Administrative Law and, on September 9, 2004, an administrative law judge (ALJ) recommended that Patterson receive an accidental disability retirement, based on the initial "traumatic event" of February 1, 1998. The board declined to adopt that determination, again finding that

Patterson did not suffer a traumatic event. Patterson appealed and the Appellate Division reversed. *In re Patterson,* 382 *N.J.Super.* 366, 375, 889 *A.*2d 456 (App.Div.2006).

We granted the board's petition for certification, 186 *N.J.* 364, 895 *A.*2d 451 (2006), and now reverse.

*Moore v. Bd. of Trs., State Police Ret. Sys.*

Glynn Moore began employment as a New Jersey State Police Officer in November 1987 and continued to be employed for fifteen years, until his retirement in November 2002. The position entitled Moore to enrollment in the SPRS.

At his pension hearing, Moore, an African–American, testified that he was exposed, on the job, to numerous incidents of racially motivated abuse carried out by fellow officers, including racist treatment; racially motivated mistreatment of others; and forced participation in racial profiling. Among the examples detailed by Moore were the use of racial epithets by fellow officers, and the placing of racist pictures and a Ku Klux Klan membership key-chain in his locker.

Two of those examples are particularly relevant to the present discussion. In one incident, occurring in November 1988, Moore stated that he observed his fellow officer "brutally beat" a twenty-eight-year-old African–American woman. Moore testified that he and his fellow officer had been dispatched to assist a vehicle that had run off an embankment. Arriving on the scene, they encountered the driver of the car, a young woman who was crying and hysterical. After removing the woman from the vehicle, Moore's fellow officer smelled alcohol on the woman's breath and took her back to the side of the road to perform sobriety tests. At that time, they were joined by two local police officers.

The woman was then handcuffed when, according to Moore, she accidentally kicked one of the officers. Moore's fellow officer immediately pulled him out of the way and began beating the woman with his fists and flashlight, and one of the local officers

did the same. Apparently, the woman was beaten badly enough to require treatment at a hospital.

Moore testified that the incident was "like a horrific blow to my mind. I was traumatized, I was scared, I was frightened and then I became angry and upset...." He stated that he related to the victim, thinking she could have been his sister; that the incident made him angry and frightened. In addition, when he complained to his sergeant, he was told to "get with the program." Apparently, the incident did not result in repercussions of any kind, which Moore testified frightened him.

In another incident, Moore testified to receiving death threats from fellow officers while assigned to the Woodstown station, during the 1990s. He stated that a friend of his was stopped and illegally searched while driving, by officers racially profiling motorists. As a result, the friend brought suit against the officers. Moore testified that after the suit was filed he was approached by his lieutenant, who instructed him to convince his friend to dismiss the action. When Moore refused, he received death threats and threats of retaliation directed towards both his friend and himself. Moore also testified that he believed that the threats could be acted upon.

According to Moore, his experiences resulted in severe anxiety and other emotional problems which led him to seek medical attention in 1999. He was placed on stress leave, and, in 2002, was informed by the State Police that he was considered permanently disabled from further employment. Moore filed an application for accidental disability benefits in 2002. In his application, Moore stated that he suffered from mental disabilities resulting from "prolonged exposure to a racially hostile work environment as a New Jersey State Trooper."

The board rejected Moore's application on June 11, 2003, determining that although Moore was permanently and totally disabled as a direct result of all the incidents described in his application, those incidents, including the 1988 beating, were not "traumatic events." In addition, the board stated that an application for

accidental disability must be filed within five years of the "original traumatic event" and found no evidence that Moore filed in a timely fashion or that he had an excuse for the late filing.

Moore challenged the determination and an ALJ recommended that the board deny the requested relief because Moore did not establish the required "traumatic event." Based on that determination the ALJ did not reach the issue of timeliness. The board adopted the recommendation on January 26, 2005. Moore appealed, and the Appellate Division affirmed. *Moore v. Bd. of Trs., State Police Ret. Sys.*, 382 *N.J.Super.* 347, 359, 889 *A.*2d 445 (App.Div.2006).

We granted Moore's petition for certification, 186 *N.J.* 365, 895 *A.*2d 452 (2006), and now reverse and remand the matter to the board.

*Guadagno v. Bd. of Trs., Police and Firemen's Ret. Sys.*

Joseph Guadagno began employment as a Corrections Officer for the New Jersey Department of Corrections in 1997, a position that entitled him to enrollment in the PFRS. During the course of his employment, Guadagno was stationed at the Albert C. Wagner Youth Correctional Facility, a prison facility which, despite its name, houses few minors. On October 28, 2002, Guadagno testified that he was working the 10:00 p.m. to 6:00 a.m. shift at that facility, in the Administrative Segregation Unit which houses inmates requiring segregation from the rest of the prison population.

Guadagno stated that, during his shift, he performed a routine cell check which entailed looking through the window of each cell to determine the status of the inmate inside. During the check, the cell doors were closed and Guadagno would not have had physical contact with the inmates. When Guadagno looked into the window of the cell housing an inmate who had threatened him during a previous incident, he encountered the inmate standing up close to the window, smiling "eerily." Guadagno testified that, at that time, the inmate threatened him and his family in a manner that caused him great fear, demonstrating knowledge of Guadag-

no's personal life. That threat was apparently the result of an incident that took place a week earlier, after Guadagno had ended the inmate's visitation time. Guadagno testified that, during that previous incident, while he was escorting the inmate back to his cell, the inmate turned to him and said "[w]hat do you think you're superman because if you are I can turn you into a paraplegic like Christopher Reeve."

Guadagno testified that, during the resulting October 28 incident, the inmate said, "I know you now. I know who you are. You're from Hamilton, you got that pizza place. You worked at that bar. I know you, I'm going to kill you." Guadagno also testified that the inmate knew he had a daughter and threatened his wife and daughter with rape and murder. Guadagno stated that during the course of his employment he had been threatened numerous times but that the inmate's threat was more than the routine, idle threats normally experienced. He also stated that the inmate informed him that, even if he was unable to carry out the threat personally, "his boys" would, a threat which Guadagno understood to be gang related.

After the shift, Guadagno reported the incident and filled out an incident report. A lieutenant to whom Guadagno reported the incident testified that Guadagno appeared visibly angry. Although he prepared the incident report that night, Guadagno refused to file a disciplinary charge against the inmate, apparently fearing reprisal. He was transferred to another area to finish the shift. Guadagno reported that when he returned home he felt distraught. He reported to work for his next scheduled shift and filed a disciplinary charge against the inmate, apparently on the advice of his union representative. Guadagno testified that, during that shift, he checked the inmate's visitation cards, learning that he had been visited by an individual who lived in Trenton (a town next to Hamilton), which Guadagno stated further increased his anxiety.

Guadagno continued working after the incident but testified that he was afraid to perform the tasks associated with his employ-

ment.  He began to use all of his sick and vacation time because of his fear of work, suffered panic attacks, and became afraid of responding to emergency alarms.  He stated that he was constantly concerned about when the inmate would be released and that, as a result of the incident, marital problems developed and he began drinking.

According to Guadagno, in March 2003, he began seeing a psychiatrist who initially recommended that he not return to work for six months.  After that period, the psychiatrist recommended that Guadagno not return to employment as a corrections officer.

On July 30, 2003, Guadagno filed an application for an ordinary disability retirement, which he later amended to claim an accidental disability retirement.  The board rejected the application, declaring that the October 28, 2002 incident was not a "traumatic event."  The board did, however, determine that Guadagno was permanently mentally disabled from further employment as a direct result of that incident.  Guadagno appealed the board's determination and a hearing was held before an ALJ on May 24, 2004.  The ALJ recommended that Guadagno be awarded an accidental disability retirement, determining that the October 28, 2002 incident was a "traumatic event."  The board did not adopt that determination, instead concluding that threats by an inmate confined to a cell could not constitute a "traumatic event."  Guadagno appealed and the Appellate Division affirmed over a dissent. *Guadagno v. Bd. of Trs., Police and Firemen's Ret. Sys.*, No. A–1832–04, 2006 *WL* 399444 (App.Div. Feb. 22, 2006).  Guadagno appeals to this Court as of right.  We now reverse and remand the matter to the board.

II

The notion of traumatically induced mental disorders is nothing new.  We outlined the history of Post–Traumatic Stress Disorder (PTSD) in *Brunell v. Wildwood Crest Police Department*, 176 *N.J.* 225, 240–41, 822 *A.*2d 576 (2003), beginning with its characterization in the late nineteenth century as "hysteria."

Later, during and after the First World War, similar symptoms were discovered in men whose wartime experiences had left them "shell-shocked."

Interest in the lasting mental effects of trauma remained strong through the Second World War, as psychologists struggled to treat soldiers who had witnessed, perpetrated, and been subject to the atrocities of war. But it was not until the Vietnam War that a broader political and psychological inquiry into the effects of combat trauma was undertaken. The experiences of Vietnam veterans who spoke out about the persistent mental difficulties that they had faced as a result of the traumatic incidents of combat led to a far-reaching rethinking of the ways in which trauma affects the individual psyche. Post-traumatic stress disorder was recognized as a mental disorder and added to the DSM–IV in 1980, largely as a result of the grassroots efforts of Vietnam veterans and their allies to give credence to the symptomology that plagued so many soldiers who had returned from that conflict.

[*Id.* at 240, 822 *A.*2d 576 (citing Judith Herman, *Trauma and Recovery* 10–12, 20, 26–28 (1997))(internal citations omitted).]

We went on:

Since its initial application to combat trauma, large-scale diagnoses of PTSD have been made in cases of survivors of domestic violence and childhood sexual abuse, asylum-seekers fleeing political violence and torture, survivors of natural disasters, and, most recently, rescue workers and others involved in the September 11, 2001, terror attacks on the World Trade Center and the Pentagon. Karen E. Krinsley & Frank W. Weathers, *The Assessment of Trauma in Adults*, 6 *PTSD Res. Q.* 1, 1–2 (Summer 1995) (describing wide variety of traumas that can lead to PTSD); National Institute of Mental Health, *Reliving Trauma: Post–Traumatic Stress Disorder*, Publication No. 01–4597 (2001), available at http://www.nimh.nih. gov/publicat/reliving/cfm (discussing widespread appearance of PTSD in aftermath of September 11th attacks).

[*Id.* at 240–41, 822 *A.*2d 576.]

Indeed, as the National Center for PTSD explains, it

is no longer considered an isolated problem for Vietnam veterans. PTSD is recognized as a major public health problem and a behavioral health problem for military veterans and active duty personnel subject to the traumatic stress of war, dangerous peacekeeping operations, and interpersonal violence.

Moreover, due to the surprisingly high prevalence of assault, rape, child abuse, disaster, and severe accidental and violent trauma in the civilian arena, PTSD is a serious public health problem in the general population. It is estimated that PTSD affects more than ten million American children or adults at some point in their lives.

[History of the National Center for PTSD, http://www.ncptsd.va.gov/ncmain/about/ nc_overview/history.html (last visited Feb. 1, 2008).]

Community-based studies reveal a lifetime prevalence for PTSD of approximately eight percent of the adult population of the United States. American Psychiatric Association, *Diagnostic and Statis-*

*tical Manual of Mental Disorders Text Revision* 466 (4th ed. 2000) (*DSM–IV–TR* ).

That is the backdrop on which our inquiry will take place.

## III

Like all of the public retirement systems, the PFRS includes provisions for the grant of ordinary and accidental disability benefits. *N.J.S.A.* 43:16A–6; *N.J.S.A.* 43:16A–7.[1] The statutes provide that a member, meeting the age and service criteria, may be retired on an ordinary allowance

> provided, that the medical board, after a medical examination of such member, shall certify that such member is mentally or physically incapacitated for the performance of his usual duty and of any other available duty in the department which his employer is willing to assign to him and that such incapacity is likely to be permanent and to such an extent that he should be retired.
>
> [*N.J.S.A.* 43:16A–6(1).]

Essentially, a qualified member who is permanently disabled for any reason will qualify for ordinary disability.

The PFRS also allows for an accidental disability retirement if

> the medical board, after a medical examination of such member, shall certify that the member is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties and that such disability was not the result of the member's willful negligence and that such member is mentally or physically incapacitated for the performance of his usual duty and of any other available duty in the department which his employer is willing to assign to him.
>
> [*N.J.S.A.* 43:16A–7(1).]

The main difference between the two is that ordinary disability retirement need not have a work connection. *N.J.S.A.* 43:16A–6; *Kasper v. Bd. of Trs. of the Teachers' Pension & Annuity Fund,*

---

[1] Both Moore and Patterson applied for benefits under the SPRS. Because the accidental disability provision of that system, *N.J.S.A.* 53:5A–10, is substantially similar to that of the PFRS, we treat only the latter in our discussion. In addition, accidental disability pensions are also offered under the Public Employees' Retirement System (PERS), *N.J.S.A.* 43:15A–43; Prison Officers' Pension Fund, *N.J.S.A.* 43:7–12; and the Teachers' Pension and Annuity Fund (TPAF), *N.J.S.A.* 18A:66–39.

164 *N.J.* 564, 573–74, 754 *A.2d* 525 (2000). In addition, an accidental disability retirement entitles a member to receive a higher level of benefits than those provided under an ordinary disability retirement. *Richardson, supra,* 192 *N.J.* at 194 n. 2, 927 *A.2d* 543.

In *Richardson,* we recently explained that, to be eligible to collect benefits under the accidental disability statutes, a claimant must show each of the following:

1. that he is permanently and totally disabled;

2. as a direct result of a traumatic event that is

    a. identifiable as to time and place,

    b. undesigned and unexpected, and

    c. caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work);

3. that the traumatic event occurred during and as a result of the member's regular or assigned duties;

4. that the disability was not the result of the member's willful negligence; and

5. that the member is mentally or physically incapacitated from performing his usual or any other duty.

[*Id.* at 212–13, 927 *A.2d* 543.[2]]

In ruling in *Richardson,* we observed that an applicant for accidental disability benefits must meet

an extraordinarily high threshold that culls out all minor injuries; all major injuries that have fully resolved; all partial or temporary disabilities; and all cases in which a member can continue to work in some other capacity. In addition, the injury must occur during and as a result of the member's performance of his job duties, thus eliminating disabilities that are sustained outside of work. Further, the disability cannot be the result of the member's "willful negligence." That is, the member cannot, by action or inaction, have brought about his disability through his reckless indifference to safety.

[*Id.* at 195, 927 *A.2d* 543 (footnote omitted).]

At issue here is whether a permanent mental injury resulting from an exclusively psychological stimulus can vault that threshold.

---

[2] "Willful negligence" is defined as a "1. [d]eliberate act or deliberate failure to act; or 2. [s]uch conduct as evidences reckless indifference to safety; or 3. [i]ntoxication, operating as the proximate cause of injury." *N.J.A.C.* 17:4–6.5.

IV

In each case the board of trustees opposes the grant of accidental disability benefits, asserting that the accidental disability statutes do not encompass the mental-mental class of injuries. The boards primarily contend that mental stressors are not external and, therefore, cannot fall within the notion of "traumatic event." In the alternative, the boards contend that if mental stressors that give rise to disabling mental injuries are "traumatic events," this Court should recognize only those events accompanied by an objectively identifiable risk of imminent physical harm.

In response, each of the members, joined by *amicus curiae*, the New Jersey State Policemen's Benevolent Association, argues that the accidental disability provisions encompass mental-mental injuries. Moreover, those parties assert that the understanding of "traumatic event" we expressed in *Richardson* is sufficiently broad to encompass the mental-mental class of injuries and that no separate standard is required.

V

The pension statutes themselves are the starting point of our analysis.

> In interpreting a statute, our overriding goal is to give effect to the Legislature's intent. The best indicator of that intent is the statutory language, thus it is the first place we look. If the plain language leads to a clear and unambiguous result, then our interpretive process is over. Only if there is ambiguity in the statutory language will we turn to extrinsic evidence. When such evidence is needed, we look to a variety of sources.
>
> [*Richardson, supra*, 192 *N.J.* at 195–96, 927 *A.2d* 543 (internal citations and quotations omitted).]

As an initial matter, the statutes expressly extend eligibility to individuals with disabling mental injuries. Both ordinary and accidental disability retirement benefits are available if a "member is *mentally* or physically incapacitated." *N.J.S.A.* 43:16A–7(1) (emphasis added); *N.J.S.A.* 43:16A–6(1). Thus coverage for mental injuries is not disputed. The only issue is whether such an injury

will be recognized as a basis for accidental disability if it is caused by an exclusively psychological trauma.

The accidental disability statutes themselves do not expressly include the mental-mental category; nor do they expressly exclude it, and the legislative history of the statutes on the subject is unrevealing. We thus look to other legislative enactments for help. We find instructive *N.J.S.A.* 40A:14–195, a statute creating county law enforcement crisis intervention centers and providing post-traumatic debriefing and counseling services for "law enforcement officers and sheriff's officers who have been involved in incidents which may produce personal or job-related depression, anxiety, stress, or other psychological or emotional tensions, traumas, pressures or disorders." The act specifically uses the term "post trauma stress disorders," *N.J.S.A.* 40A:14–198, and describes the incidents giving rise to the need for debriefing and counseling as including

the firing of a weapon or an exchange of gun fire; serious bodily injury to or the death of a juvenile; a terrorist act; a hostage situation; serious bodily injury to or the death of another law enforcement officer employed in the same agency, when that serious bodily injury or death occurred in the performance of that officer's official duties; a personal injury or wound serious bodily injury received in the performance of the officer's official duties; and such other incidents or events as the county crisis intervention services advisory council established pursuant to section 4 of P.L.1998, c. 148 (C. 40A:14–198) shall deem appropriate.

[*N.J.S.A.* 40A:14–196.]

For our purposes, the gravamen of that statute is that the Legislature has specifically recognized that a traumatic event giving rise to a mental disability, like PTSD, may, but need not, involve physical impact. That enactment sheds light on the meaning of the term "traumatic event" in the accidental disability statutes. Indeed,

[t]he sense of a law is to be gathered from its object and the nature of the subject matter, the contextual setting, and the statutes *in pari materia.* A statute is to be construed as a whole with reference to the system of which it is a part. And statutes upon cognate subjects may be considered in arriving at the legislative intention, though not strictly *in pari materia.* This principle is essential to give unity to the laws, and to connect them in a symmetrical system.

[*State v. Brown,* 22 *N.J.* 405, 415 [126 *A.*2d 161] (1956) (internal citations omitted); see also *Chase Manhattan Bank v. Josephson,* 135 *N.J.* 209, 225 [638 *A.*2d 1301] (1994).]

## VI

Although we have not specifically addressed the mental-mental category in the pension statutes, in the cognate field of workers' compensation, we have recognized that psychological stressors causing mental injuries may be categorized as "accidental," depending on the circumstances. In *Brunell,* a police officer and his partner reported to the scene of a domestic dispute. After splitting up, the officer heard gun shots and discovered his mortally wounded partner, who subsequently died as the officer watched. Finding that PTSD caused by the event could be categorized as an accidental injury under the workers' compensation statutes, we explained that "[w]ith the passage of time, our courts have come to recognize legitimate mental stress claims as a compensable psychiatric disability." *Brunell, supra,* 176 *N.J.* at 243, 822 *A.*2d 576 (citations omitted). In fact, in *Brunell* we noted that New Jersey has been credited "with leading the way in recognizing the so-called mental-mental category of compensable injury." *Ibid.*

The workers' compensation analogy is important because "[a]s originally enacted, the accidental disability statutes and the Workers' Compensation Act contained similar language, requiring personal injuries caused by an 'accident arising out of and in the course of [the] employment.'" *Richardson, supra,* 192 *N.J.* at 196, 927 *A.*2d 543 (citation omitted). Although the language of the accidental disability provisions was later amended to include "traumatic event," that amendment was not intended to decouple the statutes regarding the meaning of "accident" but only to "return [ ] the definition of accident for pension statutes to its well-established meaning by excluding the category of 'pre-existing disease plus work effort'" which had been introduced into the workers' compensation doctrine. *Id.* at 200, 927 *A.*2d 543. To be sure, a "traumatic event" and an accident in the workers' compensation context are no longer identical concepts. Given their basic

similarity, it is, nevertheless, informative that we have recognized that mental-mental injuries may be categorized as accidental injuries for the purposes of a workers' compensation claim. *Brunell, supra,* 176 *N.J.* at 246, 822 *A.*2d 576.

We have likewise modified our prior case law in the tort field to allow emotional distress claims as a result of injury without physical impact. *See, e.g., Portee v. Jaffee,* 84 *N.J.* 88, 417 *A.*2d 521 (1980) (allowing recovery for emotional distress damages caused by witnessing serious injury of loved one); *Falzone v. Busch,* 45 *N.J.* 559, 214 *A.*2d 12 (1965) (allowing recovery for injury caused by "a reasonable fear of immediate personal injury" without actual physical contact).

We are satisfied that that approach best captures the intent of the Legislature in the accidental disability statutes as well. As Judge Pressler, writing for the Appellate Division, observed in a mental-mental accidental disability case over two decades ago:

The *Cattani* formulation was designed to deal with physical trauma only. Obviously, however, the Court did not intend thereby to exclude from qualification for accidental-disability pension those employees disabled by emotional trauma. And as to those employees, the standard of external force to the body or the violent exposure of the body to external force does not really apply at all. We believe, however, that in the context of emotional trauma the general "external force or violence concept" prescribed by *Cattani* can be applied if the object of the force or violence is understood to be the mind rather than the body. Indeed, psychic trauma has been defined as "an external force or series of events [which] impinges on the mind and emotions, as distinguished from the physical body." Gordy–Gray, 1 *Attorneys' Textbook of Medicine,* § 1.20 at 1–7 (3rd ed.1974).

[*Pushko v. Bd. of Trs.,* 202 *N.J.Super.* 98, 104–05, 493 *A.*2d 1309 (App.Div.) (footnote omitted), *remanded by Pushko v. Bd. of Trs.,* 102 *N.J.* 349, 508 *A.*2d 221 (1985).]

We implicitly confirmed that interpretation last year in *Richardson* where we explained the purpose of the requirement of external force as a way of excluding "pre-existing disease plus work effort" from being considered accidental and rejected an understanding of "traumatic event" that required the experience of physical force. 192 *N.J.* at 212–13, 927 *A.*2d 543. Instead, we realigned our understanding of "traumatic event" with that previously expressed in *Cattani v. Board of Trustees, Police and*

*Firemen's Retirement System,* 69 *N.J.* 578, 355 *A.*2d 625 (1976), where we "conclu[ded] that the application of *'some kind* of external force' would pass muster and that some cases would satisfy the standard without any force at all." *Richardson, supra,* 192 *N.J.* at 211, 927 *A.*2d 543 (quoting *Cattani, supra,* 69 *N.J.* at 586, 355 *A.*2d 625) (emphasis in original).

■ Generally then, permanent mental injury caused by a mental stressor without any physical impact can satisfy the *Richardson* standard. The boards' contention that an exclusively psychological stressor cannot be a traumatic event fails on two fronts: a psychological trauma is no less "external" than a physical one, and physical force is not a requirement under the statute. So long as the fundamentals of *Richardson* are met, the accidental disability statutes will recognize the mental-mental category of injuries. That means that a permanently disabling mental injury, that is the direct result of a mental stressor that is identifiable as to time and place, undesigned and unexpected, external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work), that occurred during and as a result of the member's duties, and was not the result of the member's willful negligence, can qualify the member for an accidental disability retirement benefit.

## ·VII

We add the following caveat. "In most physical disability claims, medical analysis quickly goes beyond the subjective statement by the patient to clinical and laboratory tests by the physician. . . . In psychiatric disability claims, by contrast, medical analysis to a greater degree is analysis of the subjective statement of the patient." *Saunderlin v. E.I. Du Pont Co.,* 102 *N.J.* 402, 412, 508 *A.*2d 1095 (1986). Thus, in the context of psychological injuries, the proofs related to the traumatic nature of an event and the causal relationship between event and injury may be more problematic than in the case of a physical event. As a result the boards have expressed legitimate concerns about becoming

bogged down in litigation over idiosyncratic responses by members to inconsequential mental stressors.

The Legislature's recent enactment of *N.J.S.A.* 40A:14–198 describing "post trauma stress disorders" points the way out of that potential morass. As we have noted, the relevant statutory incidents under *N.J.S.A.* 40A:14–196 include "the firing of a weapon or an exchange of gun fire; serious bodily injury to or the death of a juvenile; a terrorist act; a hostage situation; serious bodily injury to or the death of another law enforcement officer employed in the same agency, when that serious bodily injury or death occurred in the performance of that officer's official duties; a personal injury or wound; [and] serious bodily injury received in the performance of the officer's official duties." To be sure, those categories are law-enforcement specific. However, they reflect the Legislature's general acceptance of the view of the psychiatric community regarding the quality of traumatic event that might be expected to result in a mental injury.

The *DSM–IV–TR*, a handbook published by the American Psychiatric Association, categorizes known mental disorders for the purpose of diagnosis. In its discussion of PTSD, the *DSM–IV–TR* explicitly recognizes a causal relationship between certain delineated traumatic events and a resultant mental disorder. In particular, the diagnostic criteria for PTSD includes the requirement that the person

has been exposed to a traumatic event in which both of the following were present:

(1) the person experienced, witnessed or was confronted with an event or events that involved actual or threatened death or serious injury, or a threat to the physical integrity of self or others

(2) the person's response involved intense fear, helplessness or horror.

[*DSM–IV–TR, supra,* at 467.]

In essence, in enacting *N.J.S.A.* 40A:14–196, the Legislature adopted that approach for law-enforcement officers, and we do the same with respect to all public employee accidental disability statutes.

The effect of the limitation we have imposed is to require the traumatic event to be objectively capable of causing a permanent,

disabling mental injury. Put another way, by our enunciation, we limit accidental disability recovery to stressors sufficient to inflict a disabling injury when experienced by a reasonable person in similar circumstances.

Indeed, we have previously explained that objective standards may be appropriate when the focus of a particular analysis is on the character of an event rather than its results. For example, in *Lehmann v. Toys 'R' Us, Inc.*, we interpreted the New Jersey Law Against Discrimination (LAD) to employ an objective standard, noting:

> We choose an objective standard, first, because as we explained above, the LAD is not primarily a tort scheme but rather is aimed at eradicating discriminatory conduct. An objective reasonableness standard better focuses the court's attention on the nature and legality of the conduct rather than on the reaction of the individual plaintiff, which is more relevant to damages.
>
> [132 *N.J.* 587, 612, 626 *A.2d* 445 (1993).]

That is the case here and we impose the aforementioned limitations to assure objectivity in the analysis.

■ Recapping, to obtain accidental disability benefits for a mental injury precipitated by an exclusively mental stressor, a member must satisfy the standards in *Richardson*. In addition, the disability must result from direct personal experience of a terrifying or horror-inducing event that involves actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person.

Under that standard a permanently mentally disabled policeman who sees his partner shot; a teacher who is held hostage by a student; and a government lawyer used as a shield by a defendant all could vault the traumatic event threshold.

By the addition of the latter requirements to the *Richardson* template, we assure that the traumatic event is objectively capable of causing a permanent, disabling mental injury to a reasonable person under similar circumstances.

It goes without saying that a member who seeks accidental disability benefits must prove a disabling permanent mental injury

and, in so doing, must produce such expert evidence as is required to sustain that burden. We rely upon the expertise of the boards to separate legitimate from illegitimate claims and to resolve the difficult causation problems inherent in accidental mental disability claims.

## VIII

### *Patterson v. Bd. of Trs., State Police Ret. Sys.*

■ Under the standards we have promulgated, Patterson does not qualify for accidental disability benefits. Although the conduct of his superiors was cruel, it simply did not involve actual or threatened death or *serious* injury to Patterson's physical integrity and thus failed to vault the traumatic event threshold. It may be that Patterson could have maintained a different cause of action against his employers, but accidental disability was not the proper vehicle for redress. We, therefore, reverse the Appellate Division's judgment to the contrary and reinstate the determination of the board.

### *Moore v. Bd. of Trs., State Police Ret. Sys.*

■ The board accepted Moore's claim of permanent mental disability related to all of the things that he experienced as a State Police Officer, but ruled that the litany of incidents Moore recounted was not traumatic. Indeed, Moore originally cast his own claim as one for *"prolonged exposure* to a racially hostile environment as a New Jersey State Trooper." Clearly, that prolonged exposure would not sustain characterization as a traumatic event as we have described it. If believed, it may have supported an action under the LAD, *N.J.S.A.* 10:5-1 to –49, or under the Conscientious Employee Protection Act, *N.J.S.A.* 34:19-1 to –14. Indeed Moore filed a civil rights complaint in 2001 and settled his case in 2003, ultimately receiving a promotion.

We add the following concerning two of the incidents described by Moore—his alleged witnessing of his supervisor's beating of an

African–American woman and the death threats he received as a result of his friend's racial profiling suit.

One of those events (the beating) took place approximately fourteen years before Moore filed his retirement application. According to Moore, he stood by during the beating because he was horrified by it and reported the matter to his sergeant who told him to "get with the program"; he took no further action. Apart from the problems inherent in the delay in filing, we have concluded that, as a matter of public policy, a police officer who observes the brutal assault of a citizen by a fellow officer, without interfering and without reporting the incident up the chain of command to the highest levels of authority necessary to effectuate remediation, cannot rely on the incident as the predicate for an enhanced public pension. To rule otherwise would reward dereliction of duty.

The death threat, which took place nine or ten years before Moore filed, does not present a similar policy bar. It is however subject to the five year statute of limitations applicable to state police pensions, N.J.S.A. 53:5A–10(a), and to proof that Moore's mental disability was a "direct result" of it. At the bifurcated proceeding before the ALJ, Moore had, in the wings, two physicians ready to testify regarding the issue of "delayed manifestation." They were not reached because of the ALJ's ruling regarding "traumatic event." Because that testimony continues to bear on the statute of limitations and on the causation question of whether Moore's condition was a "direct result" of the claimed incident, the matter must be returned to the board so that Moore can present his proofs. At the outset of such a hearing, Moore must demonstrate that the threats he received qualify as a traumatic event under the standard we articulate today. In light of the facts actually in the current record, Moore may not be able to surmount that burden. The determination of the Appellate Division is therefore reversed and the matter is remanded to the board for further proceedings.

*Guadagno v. Bd. of Trs., Police and Firemen's Ret. Sys.*

The board agreed that Guadagno is permanently mentally disabled and that his disability was a direct result of the threats against his wife and daughter, on October 28, 2002. The board denied Guadagno's application solely because the event was not traumatic. Given the standard we have enunciated, the credible threat of rape and murder against Guadagno's wife and daughter by a presumed gang member who knew where Guadagno lived and worked could satisfy the traumatic event element of the statute. We therefore reverse and remand the matter to the board for reconsideration of that issue in light of our ruling in *Richardson* as amplified here.

## IX

The judgment of the Appellate Division in *Patterson* is reversed and the order of the board is reinstated. The judgments of the Appellate Division in *Moore* and *Guadagno* are reversed and the matters remanded to the boards for proceedings in accordance with the principles to which we have adverted.

A–99 *For reversal and reinstatement*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

A–101 *For reversal and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

A–123 *For reversal and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.