**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5074-16T3

DAVID R. MARTELLA,

      Petitioner-Appellant,

v.

BOARD OF TRUSTEES, POLICE
AND FIREMEN'S RETIREMENT
SYSTEM,

      Respondent-Respondent.

_____

Argued February 25, 2019 – Decided March 27, 2019

Before Judges Sabatino and Sumners.

On appeal from the Board of Trustees of the Police and Firemen's Retirement System, Department of the Treasury, PFRS No. 3-10-049872.

Daniel J. Zirrith argued the cause for appellant (Law Offices of Daniel J. Zirrith, LLC, attorneys; Daniel J. Zirrith, of counsel and on the briefs; Edward H. Kerwin, on the briefs).

Amy Chung, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant

Attorney General, of counsel; Danielle P. Schimmel, Deputy Attorney General, on the brief).

PER CURIAM

Appellant David R. Martella, a police sergeant formerly employed by the City of New Brunswick, appeals the June 13, 2017 final agency decision of the Board of Trustees of the Police and Firemen's Retirement System ("the Board"), denying his application for accidental disability retirement benefits under N.J.S.A. 43:16A-7. Martella concurrently appeals the Board's December 15, 2017 decision, following a remand from this court, in which the Board reaffirmed its earlier denial.

Applying the substantial deference that must be accorded to the Board in such administrative matters when it applies the pertinent statutes within its area of expertise, we affirm.

I.

The April 6, 2013 Event

On the afternoon of April 6, 2013, appellant, then working as a police sergeant in New Brunswick, was alone on patrol in police car 906. He was acting as a road supervisor that day.

Just before 12:25 p.m., a report came in that there was a man with a gun walking down the street near Joyce Kilmer Avenue in New Brunswick.

Appellant, along with multiple other officers, responded.  He was not the first to arrive.

As appellant approached the scene, he drove down Livingston Avenue from Baldwin Street.  He then turned right off of Livingston onto Sandford Street.[1]  Appellant heard only minimal radio communications concerning how the situation with the suspect was transpiring.  The latest information he had received was from another officer, whom he believed to be Officer Cornelius Maloney, stating that Maloney was "arriving" at the scene.

Officer Maloney arrived first on the scene, while Lieutenant Steve Middleton arrived second.  Those two officers both turned onto Sandford from Joyce Kilmer.  They both stopped their cars, facing Livingston.  As they arrived, the suspect was walking down the sidewalk on Sandford towards Livingston.  Based upon the suspect's mannerisms, Lieutenant Middleton believed he was either emotionally disturbed or under the influence of drugs.  The suspect was unresponsive to those officers' attempts to engage him.

About this time, appellant turned his car right onto Sandford.  He saw, on the far end of the street, near Joyce Kilmer Avenue, the lights of other police cars, presumably from the vehicles of Officers Maloney and Middleton.

---

[1]  Apparently, the street is misspelled in the record.

3

As appellant proceeded in his squad car down Sandford, he found himself facing the suspect. The suspect had momentarily turned to face Joyce Kilmer, and feigned placing his gun on the ground.

Upon realizing the suspect's location in relation to his own, appellant "threw [his] car in reverse" to better situate himself. The suspect did not aim his gun at him at this point. At the moment appellant stopped his car to put it in reverse, the suspect turned around from facing Joyce Kilmer. He began walking towards appellant, facing Livingston.

Appellant believes he was approximately fifteen feet or less from the suspect at this point. Due to his position behind the wheel of his squad car, appellant was unable to draw his weapon. As depicted on the "dash-cam" video footage, the suspect was then located almost adjacent but slightly forward and to the right of appellant, with about one driving lane plus one parking lane of distance between them.

It was at this point that appellant initially feared for his life. According to his testimony, appellant felt that he was "done," and "a sitting duck" due to his tactically disadvantageous position in the car relative to the suspect.

Appellant got out of his vehicle while drawing his weapon, recognizing that the suspect likewise had a gun. Appellant told the suspect to "drop the gun."

4

The suspect began randomly motioning with his hands, although not pointing the gun at appellant, and asking, "You going to shoot me? You going to kill me?" The suspect appeared to appellant to be high on something.

The suspect then walked down Sandford towards Livingston. Officer Maloney, Lieutenant Middleton, an unnamed officer, and appellant followed behind him. At some point just before or while crossing Livingston, the group of officers were joined by Officers Henry Davis and Peter Maroon.[2]

As the suspect brazenly crosses the four lanes of Livingston, with the officers in tow, he was nearly hit by an oncoming vehicle. The suspect took aim at the vehicle that nearly hit him, but he did not fire his gun. Although the officers stated they felt justified in using deadly force upon the suspect at this point, they did not do so because of potential danger to civilians.

After taking aim at the vehicle, the suspect continued across Livingston, where a temple was holding services that were due to end shortly. After reaching the other side of the street, the suspect "recklessly" swung his gun hand back. The suspect then fired a shot at the pavement in the general direction of the officers, out towards his left side. It is unclear as to whether appellant was in the line of fire when this shot occurred. The police still did not yet fire.

---

[2] One of them is likely the unnamed officer from the video.

By this point, the officers were configured in a "fanned out" organization behind the suspect, composed of all five officers that had arrived. Appellant's exact location in the "fan" is not readily discernable on the video, nor is the exact order of which officer stood where. However, one officer was approximately five feet in front and to the left of appellant. Officers Maloney and Middleton, and perhaps one other officer, were to appellant's left.

The suspect continued walking for a few steps, turned, and began to raise his arm holding the gun toward the officers. Appellant testified that all of the officers were "exposed" and "in the line of fire[.]" In response to the suspect's movements, Officers Maloney, Maroon, Davis, and Middleton fired ten rounds towards the suspect, hitting him multiple times.

Appellant did not fire his own weapon at the suspect. He deemed such a shot to be unsafe for civilians in the area and an officer who stood a few feet in front of him. The record is unclear as to appellant's exact location at this time. Appellant testified that he "came around [a] car, and as they started to shoot, I just had a car in my way and a clear sight on him."

The suspect fell to the ground, and reached again for his weapon. He was quickly handcuffed by Officer Maloney, while Officer Middleton and appellant

A-5074-16T3

covered him. Appellant learned that a stray bullet had struck a car with young children in it.

After the shooting, which the suspect survived, other officers aided in securing the scene. A subsequent investigation determined that the police's use of deadly force had been justified in the situation.

Appellant's Disability Claims

Following the April 6 incident, appellant developed Post Traumatic Stress Disorder ("PTSD"), a diagnosed condition that the Board does not contest for purposes of this appeal. It is also undisputed that appellant became totally and permanently disabled as a result of his condition.

Appellant thereafter applied for accidental disability retirement benefits. The Board denied his application, determining from its initial review that appellant's injury: (1) was not "undesigned and unexpected," as required by Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys., 192 N.J. 189, 212 (2007); and (2) did not result from "direct personal experience of a terrifying or horror-inducing event," as required by Patterson v. Bd. of Trs., State Police Ret. Sys., 194 N.J. 29, 34 (2008) for mental disabilities, such as this one, not involving an injury from a physical impact. Nevertheless, the Board did approve granting ordinary disability benefits to appellant, under N.J.S.A. 43:16A-6.

The Administrative Proceedings

Appellant contested the Board's denial of his accidental disability retirement claim. The dispute was referred to the Office of Administrative Law. The assigned Administrative Law Judge ("ALJ") heard testimony from appellant, Lieutenant Middleton, and a sergeant from the Middlesex County Prosecutor's Office who had investigated the incident. The ALJ also considered various written exhibits and viewed the "dash-cam" video recording from appellant's squad car.[3]

In addition to the testimony and other proof of what had occurred at the shooting scene, the ALJ also considered evidence concerning appellant's training and experience. The record reflects that appellant had over twenty-two years of experience in law enforcement. As part of his duties as a sergeant, he was required to qualify two times each year in the use of firearms. Appellant also had received training on the handling of weapons, how to handle situations involving an armed suspect, and how to assess when to fire or not fire his weapon. Appellant contended, however, that he had no prior experience with

---

[3] As part of our review of the record on appeal, we have seen the video. Nothing in the video materially contradicts the ALJ's factual findings. See State v. S.S., 229 N.J. 360, 374-81 (2017) (clarifying the limited scope of appellate review of factual findings based on video evidence).

the sort of high-stress encounter with an armed suspect that occurred in the subject April 6, 2013 incident.

The ALJ's Decision

The ALJ concluded from the evidence presented to him that appellant was ineligible for accidental disability retirement benefits. Specifically, the ALJ agreed with the Board that appellant's encounter with the suspect was not "undesigned or unexpected," as required by Richardson, when evaluated by "an objective reasonable person's analysis of the incident." On this issue, the ALJ noted, among other things, that the suspect had not pointed his gun at appellant at the moment when appellant was in his vehicle without ready access to his gun; that the suspect later "discharged his weapon toward the ground behind him"; and that the shots fired at the suspect were made by other officers and not by appellant.

The ALJ also observed that, even treating appellant's testimony as credible, the April 6, 2013 event was not undesigned and unexpected. "It may be a rare occurrence, but it is one that does happen from time to time during the performance of a police officer's duty. The event falls clearly within a sergeant's job description." The ALJ also noted appellant's training and experience as an officer.

Concluding his application of the <u>Richardson</u> test, the ALJ wrote:

> The entire sequence of events was not out of the ordinary, and unpredictable in nature. The actions of the suspect may have been unpredictable at times; however, the event regretfully is a circumstance that our law enforcement officers face from time to time in our present culture.

Turning to the separate "mental injury" test of <u>Patterson</u>, the ALJ agreed with the Board that appellant's involvement in the incident did not rise to the level of a "traumatic or horror-inducing incident" sufficient to satisfy <u>Patterson</u>. As the ALJ reasoned:

> The exposure of petition[er] to danger did occur. However, at the time of the petitioner's interaction with the suspect, no firearm had been discharged. There was a potential threat of physical safety to petitioner and his fellow officers. However, the suspect's intentions to discharge the weapon had not yet ripened to certainty at the petitioner's most vulnerable time. These factors prevent this tribunal from concluding that a traumatic or horror-inducing event occurred.

The ALJ also rejected appellant's contention that he is entitled to accidental disability retirement benefits on the basis that such benefits had been separately granted to one or more other officers due to injuries arising out of the April 6, 2013 incident.

10

The Board's Decisions

Appellant filed exceptions to the ALJ's initial decision. On June 13, 2017, the Board rejected those exceptions and adopted the ALJ's denial of benefits.

Appellant then filed the present appeal. After a pre-briefing conference with a retired judge of this court, the parties agreed to a remand to have the Board more fully address appellant's argument of disparate treatment.

On remand, the Board reconsidered appellant's benefits application in light of his disparate treatment claim. In a three-page explanatory letter dated December 15, 2017, the Board reaffirmed its original determination.

The Board noted that it had considered appellant's case "on its own merits," unaffected by the claims of the other officers.[4] Moreover, even if those other cases were relevant, the Board distinguished appellant's circumstances in various respects. Among other things, the Board noted that appellant did not fire any shots at the suspect. The Board also underscored the ALJ's finding that the suspect had not pointed his weapon at appellant at the moment he was defenseless in the vehicle, which the ALJ found to be the "most stressful [part] of the event" for appellant.

_____

[4] Apparently, other than Middleton and Davis, no other officers at the scene filed claims except for appellant.

This appeal was then reinstated. Appellant argues that the Board and the ALJ misconstrued the factual evidence, misapplied the law, and unfairly denied him benefits despite granting benefits to two other officers.

II.

A.

The applicable legal standards for accidental disability retirement benefits are well established and do not need extensive elaboration here. As the ALJ and the Board correctly recognized, the two key Supreme Court cases on point concerning eligibility for such benefits are Richardson, 192 N.J. 189, and Patterson, 194 N.J. 29.

In Richardson, the Court held that an officer who seeks accidental disability retirement benefits must prove:

> 1. that he is permanently and totally disabled;
>
> 2. as a direct result of a traumatic event that is
>
>> a. identifiable as to time and place,
>>
>> b. undesigned and unexpected, and
>>
>> c. caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work);
>
> 3. that the traumatic event occurred during and as a result of the member's regular or assigned duties;

4. that the disability was not the result of the member's willful negligence; and

5. that the member is mentally or physically incapacitated from performing his usual or any other duty.

[192 N.J. at 212-13 (emphasis added).]

The Court in Richardson defined a "traumatic event" under the statute as "essentially the same as what [it] historically understood an accident to be – an unexpected external happening that directly causes injury and is not the result of pre-existing disease alone or in combination with work effort." Id. at 212.

In addition, a claimant such as appellant who has suffered a "permanent mental disability as a result of a mental stressor, without any physical impact," must meet an additional requirement to qualify for accidental disability retirement benefits. Patterson, 194 N.J. at 33. In Patterson, the Court explained:

The disability must result from direct personal experience of a terrifying or horror-inducing event that involves actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person. By that addition, we achieve the important assurance that the traumatic event posited as the basis for an accidental disability pension is not inconsequential but is objectively capable of causing a reasonable person in similar circumstances to suffer a disabling mental injury.

[Id. at 34 (emphasis added).]

13

Case law has made clear that a diagnosis of PTSD is not per se sufficient to qualify a claimant for accidental disability retirement benefits. Thompson v. Bd. of Trs., Teachers' Pension & Annuity Fund, 449 N.J. Super. 478, 495 (App. Div. 2017), aff'd o.b., 232 N.J. 232 (2018). Rather, a diagnosis of PTSD is merely a "backdrop" that can support a causal link between the work-related traumatic event and the claimant's disability. Ibid. The pension agencies, "not a member's psychiatrist," must evaluate whether the member's involvement in the incident itself satisfies the pertinent eligibility standards, viewed through a prism of objective reasonableness. Ibid.

In reviewing how the Board applied these eligibility standards here, we must be guided by deferential principles of appellate review. Generally, an appellate court's review of actions by an administrative agency is limited. Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011). The court must afford a "'strong presumption of reasonableness' to the administrative agency's exercise of its statutorily delegated responsibilities." Lavezzi v. State, 219 N.J. 163, 171 (2014) (quoting City of Newark v. Natural Res. Council, Dep't of Envtl. Prot., 82 N.J. 530, 539 (1980)). The administrative agency's "final quasi-judicial decision will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable or that it lacks fair support in the record."

14

Mount v. Bd. of Trs., Police & Firemen's Ret. Sys., 233 N.J. 402, 418-19 (2018) (quoting Russo, 206 N.J. at 27). That said, we review errors of any pure questions of law de novo. Russo, 206 N.J. at 27.

B.

Applying these standards, we affirm the Board's final agency decision denying appellant's claim for accidental disability retirement benefits. The denial is sufficiently grounded in substantial credible evidence in the record, and the ALJ's factual findings. The denial is not arbitrary or capricious.

In reaching this conclusion, we need not reach whether or not appellant's encounter with the armed suspect was sufficiently traumatic to qualify as a "terrifying or horror-inducing event" under the Patterson test. Even if that terror facet were met, we are nonetheless persuaded by the determinations of the Board and the ALJ that the episode, while surely unfortunate and frightening, was not objectively "undesigned and unexpected," especially for a veteran police officer such as appellant.

Sadly, as the ALJ noted, such potentially lethal street encounters are all too frequent and are part and parcel of a police officer's daily responsibilities. The ALJ and the Board did not misapply the law in reaching this determination.

## C.

We need not comment much about appellant's claims of a denial of equal protection because two other officers who were also at the scene received accidental disability retirement benefits. For one thing, the specific facts concerning those officers' personal claims were not developed at any administrative hearings, and a record-to-record comparison is not feasible.

Moreover, the Board has identified tenable factual distinctions between the discrete participation of appellant in the incident and that of the other two officers. We note in particular that those two officers, unlike appellant, experienced the trauma of firing their guns at another human being. Also, they were apparently closer in proximity to the suspect when he was being pursued on the sidewalk and waving around his own weapon. Although perhaps these distinctions are not overwhelming, the Board has articulated at least a "rational basis for the difference in treatment." Radiation Data, Inc. v. N.J. Dep't of Envtl. Prot., 456 N.J. Super. 550, 562 (App. Div. 2018); see also Engquist v. Or. Dep't. of Agric., 553 U.S. 591, 603 (2008).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

16

A-5074-16T3