**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1072-22

JEANNA MACK,

     Petitioner-Appellant,

v.

BOARD OF TRUSTEES,
PUBLIC EMPLOYEES'
RETIREMENT SYSTEM,

     Respondent-Respondent.

_____

Submitted March 12, 2024 – Decided July 29, 2024

Before Judges Haas and Gooden Brown.

On appeal from the Board of Trustees of the Public Employees' Retirement System, Department of the Treasury, PERS No. xx6882.

Springstead & Maurice, attorneys for appellant (Alfred F. Maurice and Lauren E. McGovern, of counsel and on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Payal Y. Ved, Deputy Attorney General, on the brief).

PER CURIAM

Jeanna Mack, a former employee of the Paterson School District, appeals from the October 25, 2022, final agency decision of the Board of Trustees (Board) of the Public Employees' Retirement System (PERS), denying her application for ordinary disability retirement (ODR) benefits and rejecting an administrative law judge's (ALJ's) finding that Mack was entitled to the benefits. For the reasons that follow, we reverse the Board.

I.

We glean these facts from the record. Mack was employed by the Paterson Board of Education since 2001. She began as a parent liaison and then became a paraprofessional. Ultimately, she served as a teacher's aide assisting students with special needs at schools throughout the district. Even prior to her employment with the district, Mack had suffered from vision problems and was diagnosed with keratoconus, an incurable eye condition. Although Mack had lived with the condition for over twenty years, her vision continued to deteriorate over time, eventually causing her to take a medical leave of absence during the 2019 to 2020 school year.

A-1072-22

In August 2020, Mack's optometrist, Dr. William Goldsmith, cleared her to return to work with certain accommodations. In an August 19, 2020, letter, Goldsmith specified:

> This letter is to inform you Jeanna Mack is able to return back to work starting on August 19, 2020, with a modified work schedule. She is cleared to work part-time, no more than [three] hours per day, [three] days per week. Flare-ups may occur [one to two] times per week, each occurrence leaving her near, peripheral, and depth perception [incapacitated] for hours at a time[.] This causes difficulty performing her job at a full-time level. The modified scheduling is ongoing due to [k]eratoconus not having a cure and the need for follow up appointments to help with management[.]

Goldsmith provided additional documentation to the district on September 2, 2020, stating that Mack's condition of ocular keratoconus resulted in "no vision" in the right eye, "poor vision" in the left eye, and eyeglasses did not correct the impairments. Goldsmith described Mack's symptoms as "[b]lurred" vision with "[s]ensitivity to bright lights, sun, . . . and . . . glare." He reported that Mack had impaired "night vision," and that several essential job functions could not be performed, including reading books, handouts, computers, white boards, and black boards. Goldsmith explained that Mack could not "see[ or] read" text that appeared "too small [or] too bright." Goldsmith recommended "[e]nlarged print" for "all materials" as a reasonable accommodation. He also

3

recommended "access to [PowerPoint] slides" in classrooms, meetings, and workshops. Finally, Goldsmith noted that job duties involving "[p]hysical demands" and "[peripheral]" and "depth perception" could pose a threat to Mack's health and safety as well as the health and safety of others.

After Mack submitted an accommodation request supported by Goldsmith's documentation and engaged in the interactive process, the district determined it could not accommodate her because her doctor's recommendations made it impossible for her to perform essential tasks. As a result, on September 21, 2020, Mack applied for ODR benefits at the district's suggestion, and, on September 30, 2020, Mack left her employment with the district. Esther Boone, a district human resources employee, assisted Mack in submitting an online ODR application that described Mack's disability as "ocular keratoconus," with "poor vision" in the left eye, and "no vision" in the right eye (emphasis omitted). The application also indicated that "eye[]glasses [did] not correct vision," and "all visual tasks for distance and near life activities [were] limited" (emphasis omitted). With her application, Mack submitted medical documentation prepared by Goldsmith reiterating Mack's condition and visual impairments as well as a recommendation by another treating optometrist, Dr. Steven Sorkin, that she undergo "corneal transplant [surgery]," a surgery typically

4

recommended for severe cases of keratoconus. Sorkin described keratoconus as the thinning of the cornea that causes it to "gradually bulge[] outward into a cone shape," resulting in "blurred vision," "light sensitivity and glare," and confirmed that Mack was "unable to properly perform her work duties[] due to her limited vision caused by keratoconus."

On March 18, 2021, after reviewing the medical documentation, the Board denied Mack's ODR application, finding Mack was "not totally and permanently disabled from the performance of [her] regular and assigned duties pursuant to N.J.S.A. 43:15A-42 and relevant case law." Mack filed an administrative appeal and the Board transmitted the matter to the Office of Administrative Law (OAL) for a hearing, which was conducted by an ALJ on January 6, 2022. At the hearing, Mack testified along with Goldsmith and Sorkin in support of her application. In opposition, the Board presented John Boozan, who was qualified as an expert in the field of ophthalmology.

Mack, who was then fifty-six years old, testified that her job duties included accompanying special needs students to their classes and assisting them with their lessons. Given her visual impairments, Mack stated she was unable to help the students with their reading and writing assignments because she could not decipher information from a book, handout, computer screen,

blackboard, whiteboard, or projector. She testified that during her last assignment at the "science and technology school," while accompanying her student, she had difficulty navigating "three different floors in one building." She explained that she "almost tripped . . . twice" "going up and down stairs with the hallway full of kids." Further, at times, when she was required to supervise an entire class consisting of eighteen to twenty students during a teacher's temporary absence from the classroom, Mack found the task challenging under the circumstances.

Mack explained that she was diagnosed with keratoconus over twenty years earlier and her vision had started to deteriorate over time, leading to her approved medical leave of absence during the 2019 to 2020 school year. Mack described "[her] world" as "blurry every day" and said she has extreme sensitivity to light that required her to wear "tints on [her] glasses to try to help cut down the light." She explained that she frequently suffered from "flareups" from "light around [her]." During the flareups, which would "last[] two to three days," her right eye would "drip[]" and she would be incapacitated. Mack explained that "[her] life [was her] left eye." She could read with her left eye, but only if the font was large enough. Otherwise, "nothing's clear."

A-1072-22

Mack stated that on her doctor's advice, she had tried using contact lenses to improve her vision, but the experience was "[s]cary" because she could not see what she was doing to put the lenses in her eyes and then she had difficulty getting the lenses out of her eyes. After the experience, "[she] couldn't do anything" for several days. By the time she was willing to try using contact lenses again, "[she] had no coverage" and could not afford the expense.

As her condition worsened, her "daily activities . . . changed" and simple tasks like "[b]athing, cooking, [and] cleaning" became "complicated." She lived with her daughter who had to assist her with "everything." Mack recounted that after her leave of absence, she tried to return to work because she loved her job and she loved helping people. She submitted her doctor's documentation to the district for an accommodation so that she could return to work, but she was denied and told to apply for ODR. She explained that Boone had to assist her with the ODR application because the font was "too small" for her to read.

Mack testified that over the years, Dr. Goldsmith was her "primary eyecare doctor." She was later referred to Drs. Sorkin, Theodore Perl, and Shyam Patel, who were all corneal specialists working in the same practice. Mack started seeing Sorkin in 2019. She saw Perl on August 5, 2019, and Patel on August 26, 2021. Both Perl and Patel are ophthalmologists.

Goldsmith testified that he was a licensed optometrist and had been in practice for forty-six years.[1] He had been treating Mack for "[a]t least [twenty] years," conducting annual eye examinations, and had diagnosed her with keratoconus "early on." He described keratoconus as "a progressive disease" that "causes the center of the eye to drop below the normal center." He explained that "the cornea normally is . . . nice and curved . . . like the surface of a ball" but with keratoconus, "[t]he structure weakens and the vision drops off because you get very high irregular astigmatism[2] which really can[not] be corrected properly with glasses." In his opinion, keratoconus become disabling "when the best corrective vision falls below what's generally usable."

Goldsmith testified that in addition to treating with glasses in the early stages, the condition "can be treated with contact lenses that would cover up the eye and slow down the progression." Goldsmith never prescribed contact lenses for Mack because she needed "specialty" lenses that he generally did not prescribe. Goldsmith also described a "new" treatment called "collagen cross-

---

[1] Goldsmith was admitted without objection as an expert in optometry. He testified he had attended four years at Pennsylvania College of Optometry but did not attend medical school. He specified that unlike an ophthalmologist, he did not perform surgery.

[2] Astigmatism is an imperfection in the eye's curvature whereby "the front part of the eye" is "oval almost like a pointy football," "[i]nstead of being round."

linking" which "stabilizes the . . . structure of the center of the cornea so it does[not] continue to change shape." Goldsmith further stated that corneal transplants were also a treatment option.

According to Goldsmith, "[w]hen [he] first met [Mack], she was able to get around even with blurred vision." However, over time, her vision has progressively decreased. Now, her right eye is "blind" with vision readings of "less than 20/400." Her left eye is "around 21/50." Goldsmith explained that vision readings, also known as visual acuity measurements, indicate the clarity or sharpness of one's vision. He testified that they are typically measured at a distance of twenty feet from an eye chart, with the top number of the reading representing "the test distance" and the bottom number representing the distance at which a person with normal vision can read the same line. Stated differently, it is a comparison between what Mack sees and what a person with normal vision sees.

For example, 20/20 vision, which is considered normal, means a person can see clearly at twenty feet what someone with normal vision should be able to see at that distance. On the other hand, 20/200, which is considered "legal blindness," means Mack can see at twenty feet what a person with normal vision sees at 200 feet. Goldsmith stated that "legal blindness is a matter of acuity,"

9

so a person may "still see things" but cannot identify the object due to the blurriness. Goldsmith recounted that Mack "has trouble reading up close and seeing far." He said Mack "was able to legally qualify for a driver's license" up until 2018 because "one eye c[ould] see 20/50" even though "the other eye [was] blind."

Goldsmith verified that he prepared the supporting medical documentation for Mack's leave of absence after reviewing her job requirements. He reiterated that because of her blurred vision, "reading papers, identifying people from a very long distance, [and] using a computer would all be . . . out of reach for her" without "specialized equipment" with "tremendous magnification." Goldsmith also prepared the medical documentation to support Mack's accommodation request, reaffirming her "blurry" vision and difficulty with "bright lights." Additionally, Goldsmith submitted information to the Board regarding Mack's vision to support her ODR application. Goldsmith did not believe his opinions or recommendations were contradictory but consistent with Mack's history, his medical findings at the time, and the district's responses.

After the ODR application was submitted, Goldsmith conducted an examination of Mack's eyes on July 24, 2021, during which he discovered that the vision in Mack's left eye had decreased. Mack's left eye "was around

10

20/300," meaning "a normal person can go 300 feet away" and see what Mack could "barely" see at twenty feet. Her right eye remained at 20/400. Mack reported to Goldsmith that her symptoms continued to include "[g]lare, . . . increased sensitivity to light and blurriness." As a result of the examination, Goldsmith determined that Mack's keratoconus was "not progressing the way it normally does" and the condition was "getting worse." Goldsmith testified that the standard for legal blindness was "20/200 with best correction" and Mack's vision during the July 2021 examination was "actually below" the standard for legal blindness.

In a July 24, 2021, letter, Goldsmith wrote that the condition had caused "massive irreversible scarring on both of [Mack's] corneas leading to significant vision loss that cannot be corrected with glasses or contacts."[3] He described "scarring" as "the irreversible shape of the front of [Mack's] eye," which, "[i]nstead of being round," is a "cone shape" that cannot be "alter[ed]." Goldsmith opined that Mack was permanently disabled from her job as a teacher's aide and no longer able to perform her duties. He believed it unlikely

---

[3] Goldsmith reiterated this finding in a December 13, 2021, narrative report. On cross-examination, Goldsmith was questioned about the fact that Patel's August 26, 2021, report noted "no scarring" for both eyes.

that Mack would regain her sight "without some kind of medical intervention," and, although she was "a possible" corneal transplant candidate, he left that ultimate recommendation to a surgeon and acknowledged there was "no guarantee" even with the surgery.

Sorkin, also a licensed optometrist,[4] had been practicing "[g]oing on [twenty-nine] years." He had specialized in "specialty contact lenses" for "[a]bout [twenty] years" and saw "at least" ten keratoconus patients "per day" in his current practice. He described keratoconus as

> a condition of the cornea in which the cornea develops weakening, thinning and bulging and as it progresses through . . . the process of keratoconus[,] patients will notice decreased vision with the inability to be corrected with . . . glasses.
>
> They'll complain of glare, halos, light sensitivity, tearing and also poor vision and as it progresses [it] becomes much more difficult to correct them with even contact lenses and some patients will require corneal transplantation surgery.[5]

---

[4] Sorkin, who held "an optometry degree from . . . SUNY Optometry," was also admitted as an expert in the field of optometry without objection.

[5] Sorkin explained that in some patients, keratoconus "starts and . . . stops." He opined that "it could be stable for a number of years and then progress and then [in] other patients it just rapidly progresses."

Sorkin testified that he examined Mack on August 6, 2019,[6] and September 23, 2020. During the 2020 examination, Mack complained of symptoms common in severe keratoconus patients, including "dryness, foreign body sensation, tearing and light sensitivity." Sorkin conducted "visual acuity" testing with "a Snellen chart," and a slip-lamp examination through a biomicroscope.[7] During the testing, Mack's measurement was 20/200 for the left eye. Because she could not read the eye chart from twenty feet away with her right eye, the right eye test was administered by "counting fingers." Sorkin noted that Mack's "visual acuity had declined" since her 2019 visit and "she was much more symptomatic" than she had been during the 2019 examination.

Because Mack's "current level of visual acuity with the glasses . . . was not sufficient," Sorkin discussed the possibility of treating her condition with specialized custom-made contact lenses. He also discussed the associated fees. However, he was aware that Mack had attempted to use contact lenses in the

---

[6] Sorkin was cross-examined on his assessment in the August 6, 2019, report, where he noted "keratoconus[] stable[] bilateral." He was also questioned about Perl's report a day earlier on August 5, 2019, which noted "[n]o progression since 2017." On re-direct examination, Sorkin clarified that a person with stable keratoconus could have diminished visual acuity.

[7] During other examinations, "[c]orneal topography[]" was used to "measure[] the shape of the cornea."

A-1072-22

past but was "not able to tolerate them," which was not uncommon for patients with severe keratoconus like Mack. Sorkin also talked to Mack about the possibility of "a corneal transplant," which she had discussed with Perl the year prior.

Sorkin confirmed that he had completed a form in 2020 in support of Mack's ODR application. He reiterated that given her condition and her visual acuity at that time, she could no longer perform her normal duties as a teacher's aide and there was no possibility of significant improvement. Sorkin acknowledged that his conclusion was based "50-50" on "her examination and her subjective complaints." Nonetheless, he affirmed his conclusion notwithstanding the fact that Mack's keratoconus was stable in 2020. In his opinion, Mack was incapacitated from performing her job duties even with stable keratoconus.

Sorkin believed that even if Mack tried contact lenses, success was unlikely given "her history of being intolerant of the lenses in the past" and "the fact that her keratoconus had progressed" since "she had tried them." Sorkin noted that Patel, who had seen Mack more recently than he had on August 26, 2021, agreed in his report that given Mack's history of intolerance and continued "progression" of keratoconus particularly in the right eye, contact lenses were

14

not a viable solution and recommended "corneal transplantation surgery" instead.[8]

Sorkin pointed out that although Patel had also suggested collagen cross-linking as an option, "Patel had found [that] her cornea[s were] not thick enough for the procedure to actually be done effectively." In Sorkin's opinion, Mack was not a good candidate for the collagen cross-linking "because of the severity of the keratoconus" and "the only option . . . [was] to do a corneal transplant" notwithstanding the "unknown" and "unpredictable" outcome of transplant surgery. Sorkin explained that despite the effectiveness of treating keratoconus with corneal transplants, there was still the "possibility of rejection, infection," and a lengthy recovery period.

Boozan[9] testified that in his practice, he treated "a couple keratoconus patients a month." He confirmed that he conducted a half-hour long independent

---

[8] Sorkin compared Perl's examination of Mack in 2019 with Patel's examination of Mack in 2021. According to Sorkin, when Perl saw Mack, "at that point everything was stable" and corneal transplant surgery was not recommended. However, "[w]hen . . . Patel saw [Mack] two years later[,] he had noted that her topography . . . and her visual acuity had declined."

[9] Boozan "[g]raduated from Princeton University, Cincinnati College of Medicine, [and] New York Eye Ear Infirmary." He completed a "three-year residency in ophthalmology," is "board-certified with lifetime certification in ophthalmology," and has "an active clinical practice." According to Boozan,

15

medical examination of Mack at the Board's request. He prepared a report dated January 14, 2021, based on his examination of Mack and review of her job description. Boozan also examined the medical records of Goldsmith, Sorkin, Perl, and Patel to prepare his report. He prepared a supplemental report on August 15, 2021, after reviewing additional medical records from Goldsmith.

During the January 14 examination, Boozan used the Snellen chart, "refracted" both eyes by looking into her eyes with a "[r]etinoscope," "did . . . a slit-lamp exam," which is "a narrow beam of . . . light . . . with high magnification . . . down to one tenth of a millimeter in size," and "used the ophthalmoscope to check her optic nerve and retina." He "took a history" from Mack and recorded "'a history of bilateral keratoconus.'" Mack told Boozan "she did not see well, but [did not] know why," and her "biggest complaint" was "glare in both eyes which bothered her on a daily basis." Boozan described Mack's complaint of glare as "subjective." He found subjective complaints by patients to be less trustworthy than objective testing. Boozan reported that Mack had "moderate compound myopic astigmatism where she has myopia and also myopic astigmatism in her right eye with less than 20/200 vision." On the other

_____

unlike an optometrist, an ophthalmologist has to complete "four years of medical school, a year of internship and at least three years of a residency program."

16

hand, "[t]he left eye has less myopia, a little bit more astigmatism with better vision." Boozan defined myopia as being "nearsighted," meaning "[y]ou can[not] see distance without glasses, but you can see near."

Boozan also reported that he did not find any "scarring or vertical striae." Boozan explained the significance of that finding as follows:

> Keratoconus is a progressive corneal thinning which leads to scarring in the cornea and . . . the vertical striae are stress lines from the progressive curvature steepening and the thinning of the cornea and those are signs of more significant disease and I did not see any.

Based on his finding of "lack of scarring and striae[,] which are symptoms of advanced disease," Boozan concluded Mack had "stable keratoconus." According to Boozan, Mack "did not have advanced keratoconus nor progressive keratoconus" and "there[ was] no reason why her vision should have deteriorated." In that regard, Boozan agreed with Perl's August 5, 2019, finding and discounted the other doctors' findings. He noted that the vison acuity measurements "between the doctors [have] fluctuated" and been inconsistent, and they have never seen "scarring" or "striae." Boozan did not believe that the poor visual acuity readings recorded by Goldsmith and Sorkin were correct.

Accordingly, Boozan opined that Mack was not totally and permanently disabled from her job duties when she applied for disability back in September

17

2020. Boozan further testified that his opinion did not change after reviewing Goldsmith's updated visual acuity measurements because they were not the best measurements. Boozan explained that Mack's "eye was never refracted," meaning "she probably had her glasses on and they just took what her vision was" without "check[ing] whether the prescription had changed." Boozan maintained his position even after reviewing Patel's more recent August 26, 2021, examination report.

On August 19, 2022, the ALJ issued a decision reversing the Board's original determination denying Mack ODR benefits. The ALJ detailed Mack's testimony, describing her responsibilities as a paraprofessional, her daily challenges as her vision began to deteriorate, and the events leading to her submission of an application for ODR benefits. He found "Mack to be a very credible witness and party, who only reluctantly and as a last resort, was forced to leave her job [and] elected to file for ordinary disability." (Emphasis omitted). He noted that "if [Mack] could return to her old job, she would, but the District itself by denying [her] effort to return part-time, recognized that . . . Mack would be unable to perform the duties required, even on a part-time basis."

The ALJ elaborated:

> Although somewhat embarrassed by her condition, . . . Mack offered clear testimony about what she needs to do just to cope with the daily challenges of her vision problems. It should be noted here, and supports the credible and open nature of her testimony that throughout the entire proceeding, which was held over Zoom, . . . Mack was testifying from a darkened room, with only one light on and the shades drawn to keep outside light from coming in, periodic breaks in her testimony were needed, and she often sat at an angle to avoid too much light from coming into her eyes, including the glare of the computer screen.

The ALJ also found Goldsmith "to be a credible witness on all fronts, in his capacity as . . . Mack's primary optometrist." The ALJ found that Goldsmith "provided very specific and understandable details about . . . Mack's condition," including "limitations with life activities, and challenges with essential job functions." The ALJ pointed out that although Goldsmith "cleared" Mack to return to work after her leave of absence, Goldsmith "did not believe . . . that . . . Mack could return to work on a full-time basis" and "sought reasonable accommodations" on her behalf. Similarly, the ALJ found Sorkin to be a credible witness based on his "demeanor" and "the content" of his testimony. The ALJ discussed Sorkin's recommendation of purchasing "expensive contact lenses which would hopefully modify and improve [Mack's] vision" but recognized that Mack "was in the middle of an unpaid leave of absence," and "did not have the necessary funds available."

19

In contrast, the ALJ determined that Boozan's testimony was not credible and "not truly reflective of the challenges [Mack] faces on a daily basis." (Emphasis omitted). The ALJ explained that Boozan only examined Mack once, "was not familiar with her long history of eyesight problems," and was "the only person in th[e] case who concluded that . . . Mack [was] not disabled." Although Boozan "is an ophthalmologist" who is "familiar with the condition" and has an "impressive medical pedigree," according to the ALJ, Boozan admitted he did not specialize "[i]n dealing with patients [with] keratoconus" and "seemed more concerned as he testified about defending his reputation than about . . . Mack's overall condition."

"[A]fter observing [Boozan] and listening to his testimony that essentially disregard[ed] . . . or ignore[d] the statements and medical support provided by . . . Goldsmith and Sorkin, who were far more familiar with . . . Mack by treating her on a regular basis," the ALJ concluded he was "unable to rely on [Boozan's] expert testimony, as it [was] not truly reflective of the challenges . . . Mack face[s] on a daily basis just to get through the day," (emphasis omitted). According to the ALJ, "while [he was] not allowed to disregard [Boozan's] testimony," he found that most of "Boozan's testimony and conclusion that . . . Mack [was] not disabled should be disbelieved."

A-1072-22

The ALJ explained:

> During his testimony, . . . Boozan made several contradictory statements and conclusions that seemed clear he was not thoroughly familiar with the challenges . . . Mack was facing.  He admitted that he had not testified in court for three years, had never testified for a petitioner.  Though his credentials in the field were somewhat impressive, he came across as a witness biased in favor of [the Board's] position, thereby taking away from his credibility as a witness.
>
> Among the inconsistencies was not taking a full history from . . . Mack, not providing support for his finding that "[ . . . ]Mack could not have decompensated so quickly when she had this condition for [thirty] years."  Without being a specialist in the area, he s[t]ated that the glare . . . Mack suffers from is not related to keratoconus.  He went on to criticize the findings of both . . . Goldsmith and . . . Sorkin, each of whom were far more familiar with . . . Mack's condition and treated her for many years.
>
> . . . .
>
> In his supplemental report dated August 15, 2021, . . . Boozan continued to ignore the findings of . . . Mack's two treating physicians, as well as a third doctor . . . she had seen, each of whom determined within a reasonable degree of medical certainty that the [k]eratocon[]us was significantly impairing . . . Mack's ability to see and do activities of daily living.
>
> . . . .
>
> . . . Boozan's conclusion also ignores the District's determination that it cannot accommodate her, with the limitations that she has.

21

The ALJ concluded that Mack "exceed[ed] the[] threshold requirements . . . to be eligible for [ODR benefits]." The ALJ found Mack was "fully disabled, unable to return to work, unable to complete activities of daily life without assistance," and therefore "entitled to an award of ordinary disability," (emphasis omitted). As such, the ALJ reversed the Board's determination denying Mack's application for ODR benefits based on "the opinion of her treating physicians, as well as her own very credible description of her condition, and the inability of her employer to accommodate her significant limitations when she tried with medical support to return to work on a part-time basis."

The Board filed exceptions to the ALJ's decision. On October 25, 2022, the Board issued a final administrative decision, rejecting the ALJ's decision and reaffirming its original denial of benefits. In its decision, the Board "adopt[ed] the ALJ's factual findings," but made "additional findings of fact." First, the Board highlighted Boozan's academic, medical, and professional credentials, and distinguished ophthalmologists from optometrists, specifying that ophthalmologists "complete four years of medical school, three years of residency, and perform surgery," while optometrists "go to optometry school for

22

four years, cannot perform surgeries, and mostly perform routine eye exams for glasses and contacts."

Next, the Board detailed inconsistencies in Mack's visual acuity tests and conflicting medical findings as follows:

> Boozan performed an eye exam on . . . Mack where he found that she has myopic (i.e., nearsighted) astigmatism in her right eye with less than 20/200 vision at distance. In the left eye, Mack had less myopia but a little bit more astigmatism with better vision at 20/80 for distance. For nearsighted vision, Mack had 20/400 vision in both eyes. . . . Boozan indicated that the 20/400 result for nearsighted vision in the left eye does not make sense in light of the 20/80 reading for distance vision. A reading of 20/400 is much worse than a reading of 20/80. . . . Boozan explained that when testing near vision and far vision at the same time in keratoconus patients, near vision should always be better because the target is closer and much bigger, making it easier to see.
>
> . . . Boozan also explained that the results of the left eye testing did not make sense in terms of the rate of decompensation in visual acuity because in his experience of treating keratoconus patients, vision does not decompensate this quickly in patients who have had the disease long term. He also pointed out the inconsistent visual acuity readings between her treating physicians. For example, on August 5, 2019, [Perl] . . . determined her visual acuity to be 20/150 in the right eye and 20/60 in the left eye. The next day, on August 6, 2019, . . . Sorkin determined her visual acuity to be 20/80 in the right eye and 20/50 in the left eye. . . . Boozan's testing did not reveal scarring, striae or stress lines, curvature steepening of the cornea, or

23

thinning of the cornea, all of which would be signs of a significant disease. . . . Boozan's findings were consistent with [Patel's] . . . findings on August 26, 2021, which found no scarring or striae or any worsening of pre-existing bowing and thinning.

[(Citations omitted).]

Critically, the Board rejected the ALJ's finding that Mack's "'entire testimony was credible,'" stating that the finding was not "'supported by sufficient, competent, and credible evidence in the record'" (quoting N.J.S.A. 52:14B-10(c)). According to the Board, "Mack's testimony about her condition, her symptoms, her job description, the disability application process, and examination by . . . Boozan was not credible or consistent." The Board stated Mack "inconsistently described what she could or could not see," "was not able to identify or approximate when the symptoms she considers disabling, such as the glare, actually began," was unable "to estimate whether or not it was ten years since her symptoms began," and "was not able to identify or approximate when she began having trouble performing her job duties." Further, the Board found that Mack was "inconsistent" about her reasons for refusing a contact lens trial, "inconsistently" described "her job duties, obligations, and responsibilities," and provided an incredulous account of how she completed the online disability application with Boone's assistance.

Next, the Board rejected the ALJ's legal conclusions, determining that "the ALJ solely relied on . . . Mack's subjective complaints about disability and failed to explain how . . . Goldsmith and Sorkin's testimony supported the conclusion that . . . Mack [w]as totally and permanently disabled from her job duties." The Board found that Mack "failed to satisfy her burden that she was totally and permanently disabled at the time she left employment in September 2020." Further, the Board determined "Boozan's conclusion was more in accordance with . . . Mack's medical history, the results of her objective eye examinations, and the opinions of her treating ophthalmologists." Thus, the Board credited Boozan's opinion and rejected the opinions of Mack's doctors.

According to the Board, Boozan's opinion "deserve[d] greater weight" than the opinions of Goldsmith and Sorkin because Boozan's "education and experience as an ophthalmologist [was] far superior to [their] education and experience." Further, the Board noted that Boozan's objective findings "were consistent with . . . Perl and . . . Patel's findings," and Boozan "did not base his conclusion solely on visual acuity like . . . Goldsmith and . . . Sorkin did," as visual acuity tests have "a subjective component that requires the patient to give answers."

The Board explained,

A-1072-22

[d]ue to the inconsistent visual acuity readings throughout the record, . . . Boozan's objective testing is a more reliable indicator of whether . . . Mack is actually totally and permanently disabled from her job duties. The Board therefore finds that . . . Boozan's objective testing revealed that . . . Mack was not totally and permanently disabled from her job duties, and is far more reliable than her other physicians who relied on . . . Mac[k]'s subjective complaints.

Additionally, the Board rejected Goldsmith's "biased and inconsistent opinions regarding . . . Mack's condition" as "not reliable or credible." The Board emphasized that in Goldsmith's September 2019 questionnaire supporting Mack's request for medical leave, Goldsmith stated that Mack could not "perform her job duties" and had "no usable vision in her right eye." However, one year later, Goldsmith wrote an August 19, 2020, letter indicating that "Mack could return to work on modified duty." One month later, on September 16, 2020, Goldsmith "filled out a form saying that . . . Mack was totally and permanently disabled from her job duties." Additionally, in Goldsmith's July 24, 2021, letter, he indicated that Mack "had 'massive irreversible scarring' on her corneas," even though his examination report "from the same day" did not include that detail, and no other physician found evidence of scarring. Based on these discrepancies, and Goldsmith's "long-standing relationship" with Mack,

26

the Board concluded that Goldsmith "appears to support [Mack] when she requests it" and his opinion could not be relied upon.

Similarly, the Board found Sorkin's testimony unreliable because both his August 6, 2019, and September 30, 2020, examinations noted that Mack's "keratoconus was 'stable.'" "However, in 2020[,] he determined that Mack was totally and permanently disabled" although "he was unable to perform a topography test to measure the shape of . . . Mack's cornea" during his 2020 examination. Sorkin also "admitted that his conclusion . . . was based, in part, on [Mack's] subjective complaints." Thus, the Board rejected the ALJ's conclusion that Sorkin's testimony was reliable based on Sorkin's failure to perform an objective topography test and reliance on Mack's subjective complaints.

Finally, the Board rejected the ALJ's finding that Mack met her burden of establishing that she is "incapable of performing duties" as a paraprofessional in general, and criticized the ALJ for not "identify[ing] which duties . . . Mack could not perform." The Board also rejected the ALJ's finding that the district's denial of Mack's accommodation request was "a contributing factor in determining that Mack was totally and permanently disabled," noting that the school's denial of the request was in the context of the Americans with

Disabilities Act, 42 U.S.C. §§ 12101 to 12213, and "not relevant to the determination of whether . . . Mack is totally and permanently disabled from her job duties as a paraprofessional." As such, Mack's application for disability benefits was denied. This appeal followed.

## II.

At the outset, we acknowledge that our standard of review of an administrative agency's decision is limited, In re Stallworth, 208 N.J. 182, 194 (2011), and "[w]e recognize that agencies have 'expertise and superior knowledge . . . in their specialized fields," Hemsey v. Bd. of Trs., Police & Firemen's Ret. Sys., 198 N.J. 215, 223 (2009) (omission in original) (quoting In re License Issued to Zahl, 186 N.J. 341, 353 (2006)). Therefore, we will not reverse an agency's decision "'unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record.'" Mount v. Bd. of Trs., Police & Firemen's Ret. Sys., 233 N.J. 402, 418 (2018) (quoting Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)).

To determine whether an administrative agency's decision is arbitrary, capricious, or unreasonable, we must assess:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law;

28

(2) whether the record contains substantial evidence to support the findings on which the agency based its action; and

(3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018) (quoting Stallworth, 208 N.J. at 194).]

"The burden of proving that an agency action is arbitrary, capricious, or unreasonable is on the challenger." Parsells v. Bd. of Educ., 472 N.J. Super. 369, 376 (App. Div. 2022).

Although we will not "substitute [our] own judgment for the agency's," Allstars Auto Grp., Inc., 234 N.J. at 158 (internal quotation marks omitted) (quoting Stallworth, 208 N.J. at 194), we are not "'bound by an agency's interpretation of a statute or its determination of a strictly legal issue, particularly when that interpretation is inaccurate or contrary to legislative objectives,'" Mount, 233 N.J. at 418-19 (internal quotation marks omitted) (quoting Russo, 206 N.J. at 27). Nevertheless, "we defer to [agency] fact[-]findings that are supported by sufficient credible evidence in the record." McClain v. Bd. of Rev., Dep't of Lab., 237 N.J. 445, 456 (2019); see also Quigley v. Bd. of Trs. of the Pub. Emps.' Ret. Sys., 231 N.J. Super. 211, 220

(App. Div. 1989) ("In considering the appeal from the decision of the Board of Trustees, we are cognizant that we are reviewing its findings and not those of the administrative law judge.").

Turning to the governing statute and case law that control this retirement plan, N.J.S.A. 43:15A-42 provides in pertinent part that:

> A member [of PERS], under [sixty] years of age, who has [ten] or more years of credit for New Jersey service, shall, . . . upon his[ or her] own application or the application of one acting in his[ or her] behalf, be retired for ordinary disability by the board of trustees. The physician or physicians designated by the board shall have first made a medical examination of him[ or her] . . . and shall have certified to the board that the member is physically or mentally incapacitated for the performance of duty and should be retired.

"Essentially, a qualified member who is permanently disabled for any reason will qualify for ordinary disability." Patterson v. Bd. of Trs., State Police Ret. Sys., 194 N.J. 29, 42 (2008). "The applicant for ordinary disability retirement benefits has the burden to prove that he or she has a disabling condition and must produce expert evidence to sustain this burden." Bueno v. Bd. of Trs., Tchrs.' Pension & Annuity Fund, 404 N.J. Super. 119, 126 (App. Div. 2008). Significantly, the member must also show the disabling condition is total and permanent. See Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys., 192 N.J. 189, 195 (2007) (holding an applicant is not permanently and

totally disabled if the applicant "can continue to work in some other capacity");

<u>Bueno</u>, 404 N.J. Super. at 124; <u>Patterson</u>, 194 N.J. at 42.

Mack argues that the Board "erred when it made additional findings of fact that were incorrect, irrelevant[,] or unsupported by the evidence and then incorrectly used these facts to overrule the [ALJ's] credibility decisions." The Board counters that Mack has not met her burden of proving that the final decision is "unreasonable and unsupported by sufficient credible evidence" because her testimony was not credible and she "failed to offer reliable medical expert testimony that she was totally and permanently disabled from the duties of a paraprofessional."

Under N.J.S.A. 52:14B-10(c), "[a]ll hearings of a State agency required to be conducted as a contested case under this act or any other law shall be conducted by an [ALJ,]" who then issues a report and decision "recommend[ing] findings of fact and conclusions of law" to the agency. "[U]pon a review of the record submitted by the [ALJ]," the agency

> may reject or modify findings of fact, conclusions of law or interpretations of agency policy in the decision, but shall state clearly the reasons for doing so. The agency . . . may not reject or modify any findings of fact as to issues of credibility of lay witness testimony unless it is first determined from a review of the record that the findings are arbitrary, capricious or unreasonable or are not supported by sufficient,

competent, and credible evidence in the record. In rejecting or modifying any findings of fact, the agency head shall state with particularity the reasons for rejecting the findings and shall make new or modified findings supported by sufficient, competent, and credible evidence in the record.

[Ibid.]

An agency is "not at liberty to simply substitute its judgment for that of the ALJ's." Cavalieri v. Bd. of Trs. of Pub. Emps. Ret. Sys., 368 N.J. Super 527, 534 (App. Div. 2004). ALJs are not to be considered "second-tier players or hold an inferior status as factfinders." In re Hendrickson, 235 N.J. 145, 160 (2018). "When an ALJ has made factual findings by evaluating the credibility of lay witnesses, the Pension Board may no longer sift through the record anew to make its own decision, which will be affirmed if it is independently supported by credible evidence." Cavalieri, 368 N.J. Super. at 534. Where the record, "can support more than one factual finding, it is the ALJ's credibility findings that control, unless they are arbitrary or not based on sufficient credible evidence in the record as a whole." Id. at 537; see H.K. v. Dep't of Hum. Servs., 184 N.J. 367, 384-85 (2005) (criticizing an agency head for rejecting an ALJ's credibility determinations of lay witnesses); Cavalieri, 368 N.J. Super. at 533-34 ("[T]he Pension Board could not reverse an ALJ's factual finding based upon the credibility of a lay witness without demonstrating that the ALJ's findings were

32

'arbitrary, capricious or unreasonable or . . . not supported by sufficient, competent, and credible evidence in the record'" (omission in original) (quoting N.J.S.A. 52:14B-10(c))).

Critically, an agency's review of expert witness credibility determinations is not subject to the same constraints as that of lay witness determinations. See In re Adoption of Amends. to Ne., Upper Raritan, Sussex Cnty., 435 N.J. Super. 571, 584 (App. Div. 2014) ("[T]he limitation in N.J.S.A. 52:14B-10(c) does not apply to the testimony of expert witnesses."); ZRB, LLC v. N.J. Dep't of Env't. Prot., 403 N.J. Super. 531, 561 (App. Div. 2008) (explaining that expert testimony is "not subject to the constraints of N.J.S.A. 52:14B-10(c)"). Nonetheless, we give "'due regard to the opportunity of the one who heard the witnesses to judge . . . their credibility,'" In re Taylor, 158 N.J. 644, 656 (1999) (quoting Close v. Kordulak Bros., 44 N.J. 589, 599 (1965)), and defer to credibility findings "that are often influenced by matters such as observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record," State v. Locurto, 157 N.J. 463, 474 (1999).

When evaluating expert testimony, generally, "where the medical testimony is in conflict, greater weight should be accorded to the testimony of the treating physician" as opposed to an evaluating physician who has

examined the employee on only one occasion. Bialko v. H. Baker Milk Co., 38 N.J. Super. 169, 171 (App. Div. 1955). "Nevertheless, expert testimony need not be given greater weight than other evidence nor more weight than it would otherwise deserve in light of common sense and experience." Torres v. Schripps, Inc., 342 N.J. Super. 419, 430 (App. Div. 2001) (citing In re Yaccarino, 117 N.J. 175, 196 (1989)). Accordingly, "[t]he factfinder may accept some of the expert's testimony and reject the rest." Id. at 430-31 (citing Todd v. Sheridan, 268 N.J. Super. 387, 401 (App. Div. 1993)).

Moreover, "a factfinder is not bound to accept the testimony of an expert witness, even if it is unrebutted by any other evidence." Id. at 431 (citing Johnson v. Am. Homestead Mortg. Corp., 306 N.J. Super. 429, 438 (App. Div. 1997)). "Indeed, a judge is not obligated to accept an expert's opinion, even if the expert was 'impressive.'" State v. M.J.K., 369 N.J. Super. 532, 549 (App. Div. 2004) (quoting State v. Carpenter, 268 N.J. Super. 378, 383 (App. Div. 1993)). "'[T]he weight to which an expert opinion is entitled can rise no higher than the facts and reasoning upon which that opinion is predicated.'" State v. Jenewicz, 193 N.J. 440, 466 (2008) (quoting Johnson v. Salem Corp., 97 N.J. 78, 91 (1984)). "This is particularly true when, as here, the factfinder is confronted with directly divergent opinions expressed by the experts." M.J.K.,

34

369 N.J. Super. at 549. The weight accorded to an expert's testimony can depend on several factors, such as whether the expert is testifying regarding their specialty, if their conclusions are largely based on the patient's subjective complaints or on a cursory examination, and if their opinions are supported by objective evidence corroborated or contradicted by other physicians. Angel v. Rand Express Lines, Inc., 66 N.J. Super. 77, 86 (App. Div. 1961). The factfinder, rather than a reviewing court, "is better positioned to evaluate the witness' credibility, qualifications, and the weight to be accorded [his or ]her testimony." In re Guardianship of DMH, 161 N.J. 365, 382 (1999).

Here, the ALJ observed Mack testify, describing her testimony as "clear," "detailed," and open about how she manages life with keratoconus. The ALJ assessed Mack's demeanor, the accommodations she needed to testify, the details she provided about living with her condition, and her desire to return to work, concluding that Mack was credible. None of the Board's proposed inconsistences or discrepancies provide a reasonable basis for discrediting Mack's testimony. See In re Pub. Serv. Elec. & Gas Co., 35 N.J. 358, 376 (1961) ("Any review of the facts must be confined to the question of whether they are supported by substantial evidence, i.e., such evidence as a reasonable mind

35

might accept as adequate to support a conclusion." (Quoting In re Hackensack Water Co., 41 N.J. Super. 408, 418 (App. Div. 1956))).

Regarding the expert testimony, the Board's determination of unreliability is not supported by sufficient credible evidence in the record as a whole. "[W]hen an agency's decision is plainly mistaken, in the interest of justice we will decline deference to its decision." W.T. v. Div. of Med. Assistance & Health Servs., 391 N.J. Super. 25, 36 (App. Div. 2007). Such is the case here. Sorkin's decades of experience treating keratoconus patients does not support the Board's assessment that Boozan's experience is "far superior." Moreover, Sorkin's partial reliance on objective findings belies the Board's determination that only Mack's subjective complaints were considered in formulating his opinion.

Further, the Board's heavy reliance on Boozan's testimony is undermined by Boozan's speculation about the reliability of Mack's treating doctors and underlying medical reports. Although the Board's decision regarding Goldsmith may be entitled to deference, based upon our review, we are satisfied that the Board's final determination is not "founded upon sufficient credible evidence seen from the totality of the record." Gerba v. Bd. of Trs. of Pub. Emps.' Ret. Sys., 83 N.J. 174, 189 (1980), overruled in-part on other grounds by Maynard v.

Bd. of Trs. of Tchrs.' Pension & Annuity Fund, 113 N.J. 169 (1988).

Accordingly, we are constrained to reverse.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION